**E-Filed 6/23/10**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| CHUBB CUSTOM INSURANCE COMPANY, for itself and as the subrogee of, and in the name of TAUBE-KORET COMPUS FOR JEWISH LIFE,<br><br>Plaintiff,<br><br>v.<br><br>SPACE SYSTEMS/LORAL, INC., et al.,<br><br>Defendants. | Case Number C 09-4485 JF (PVT)<br><br>**ORDER[1] GRANTING MOTIONS TO DISMISS WITH LEAVE TO AMEND**<br><br>Re. docket nos. 71, 73, 75 |

Plaintiff Chubb Custom Insurance Company ("Chubb") brings the instant action pursuant to the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq., as well as various state laws, seeking recovery of costs it incurred on behalf of one if its insureds, the Taube-Koret Campus for Jewish Life ("Taube-Koret"). Chubb alleges that Defendants are jointly and severally liable for these costs, which allegedly were incurred in response to releases or threatened releases of hazardous substances at or near a

---

[1] This disposition is not designated for publication in the official reports.

1    location Taube-Koret currently owns.

2        Defendants Ford Motor Company ("Ford Motor"), Sun Microsystems, Inc. ("Sun"), and

3    Chevron Corporation ("Chevron") (collectively "Moving Defendants") move to dismiss or strike

4    portions of Chubb's complaint or, in the alternative, for a more definite statement.  For the

5    reasons discussed below, the motions to dismiss will be granted, with leave to amend.

6                                    **I. BACKGROUND**

7         This action involves five properties in Palo Alto, California: 3825, 3963, and 3977

8    Fabian Way, 901 San Antonio Road (formerly 3939 Fabian Way), and 851 San Antonio Road

9    (collectively "the Site").  (First Am. Compl. ("FAC")  ¶9.)  Chubb alleges that the Site is part of

10   a larger, forty-seven-acre site that was owned and occupied by Defendant Ford Aerospace &

11   Communications Corporation ("Ford Aerospace") (now known as Defendant Space

12   Systems/Loral, Inc. ("SS/L")) from approximately 1959 until 1990.  (*Id.* at ¶¶ 9, 26.)  According

13   to the FAC, Ford Aerospace used the larger site to manufacture satellites and satellite equipment.

14   (*Id.* at ¶ 26.)  Chubb alleges that Ford Motor sold the assets of Ford Aerospace to SS/L in 1990.

15   (*Id*. at ¶ 20.)  It alleges further that SS/L "currently occupies all of the buildings at the Site except

16   for a building at 901 San Antonio Road ('Building 1')."  (*Id.* at ¶ 19.)

17        In 1988, two years before Ford Motor sold Ford Aerospace's assets to SS/L, Ford

18   Aerospace sold a twelve-acre parcel of the Site to Sun; Sun owned and operated that parcel,

19   which included a building ("Building 1") and an adjoining parking lot, until June 2002.  (*Id.* at ¶

20   23.)  In June 2002, Taube-Koret purchased the twelve-acre parcel from Sun.  (*Id.*)  In 2003, that

21   parcel was sub-divided into a four-acre parcel ("Parcel 1") and an eight-acre parcel ("Parcel 2"),

22   the latter of which Taube-Koret owns today.  (*Id.*)

23        Chubb alleges that Chevron owned and operated a service station located at 851 San

24   Antonio Road between 1960 and 1977.  (*Id.* at ¶ 14.)

25        On August 12, 2003, following its acquisition of Parcel 2, Taube-Koret "was named as a

26   discharger [of hazardous substances] with respect to the Site by the California Regional Water

27   Quality Control Board ('RWQCB'). . . .  [Taube-Koret] was held strictly liable for complying

28   with certain Cleanup Orders issued by RWQCB, even though [Taube-Koret] did not discharge or

                                          2

1  caused [sic] to be discharged hazardous substances that resulted in the issuance of the Cleanup

2  Orders." (*Id.* at ¶ 13.)

3        As a result of the Cleanup Orders and other orders issued by governmental agencies

4  including the California Department of Toxic Substances, Taube-Koret "made claims pursuant to

5  an insurance policy issued by Chubb, for response costs and attorneys [sic] fees incurred in

6  connection with the investigation and cleanup of Site related substances on and around Parcel 2,

7  in compliance with the RWQCB Orders." (*Id.* at ¶ 17.)  In response to the claims and

8  "[p]ursuant to the terms of [the insurance policy Chubb issued to Taube-Koret in 2002], Chubb

9  paid $2,400,000, for [Taube-Koret's] response costs and attorneys [sic] fees incurred in

10  connection with the investigation, assessment and cleanup of Site related hazardous substances."

11  (*Id.* at ¶ 18.)  Chubb alleges that as a result of its payment, Taube-Koret "has been fully

12  compensated and has been made whole." (*Id.*)

13        On September 23, 2009, Chubb filed the instant action, alleging that Defendants each

14  bear responsibility for the hazardous substances that prompted the Cleanup Orders and other

15  governmental action and seeking recovery for the costs it has incurred on behalf of Taube-Koret.

16  Following the Court's February 23, 2010, order granting Defendants' respective motions to

17  dismiss with leave to amend, Chubb filed the operative First Amended Complaint on March 25,

18  2010.  Moving Defendants filed the instant motions on May 3, 2010.

19                              **II. LEGAL STANDARD**

20  **A.    Motions to dismiss for failure to state a claim**

21         Dismissal under Fed. R. Civ. P. 12(b)(6) "is appropriate only where the complaint lacks a

22  cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v.*

23  *Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).  For purposes of a motion to

24  dismiss, the plaintiff's allegations are taken as true, and the court must construe the complaint in

25  the light most favorable to the plaintiff. *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969).  At the

26  same time, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need

27  detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment]

28  to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of

1  a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)

2  (internal citations omitted).  Thus, a court need not accept as true conclusory allegations,

3  unreasonable inferences, legal characterizations, or unwarranted deductions of fact contained in

4  the complaint.  *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754-755 (9th Cir. 1994).

5  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of

6  misconduct, the complaint has alleged–but it has not 'show[n]'–'that the pleader is entitled to

7  relief.'" *Ashcroft v. Iqbal*, 556 U.S. —, 129 S.Ct. 1937, 1590 (2009) (quoting Fed. R. Civ. P.

8  8(a)(2)).   In addition, a "court may disregard allegations in the complaint if contradicted by facts

9  established by exhibits attached to the complaint." *Sumner Peck Ranch v. Bureau of*

10  *Reclamation*, 823 F. Supp. 715, 720 (E.D. Cal. 1993) (citing *Durning v. First Boston Corp.*, 815

11  F.2d 1265, 1267 (9th Cir.1987)).

12      Leave to amend must be granted unless it is clear that the complaint's deficiencies cannot

13  be cured by amendment.  *Lucas v. Dep't of Corrs.*, 66 F.3d 245, 248 (9th Cir. 1995).  When

14  amendment would be futile, however, dismissal may be ordered with prejudice.  *Dumas v. Kipp,*

15  90 F.3d 386, 393 (9th Cir. 1996)*.*

16  **B.    Motions to Strike**

17      Pursuant to Federal Rule of Civil Procedure 12(f), the court may "strike from a pleading

18  an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Where

19  the damages sought in a prayer for relief are not recoverable as a matter of law, a motion to strike

20  may be used to strike the prayer for such damages.  *Bureerong v. Uvamas*, 922 F. Supp. 1450,

21  1479, n.34 (C.D. Cal. 1996) (citing *Tapley v. Lockwood Green Engineers, Inc.*, 502 F.2d 559,

22  560 (8th Cir. 1974)); *Wilkerson v. Butler*, 229 F.R.D. 166, 172 (E.D. Cal. 2005).

23      The grounds for a motion to strike must appear on the face of the complaint and the court

24  must view the pleading in the light most favorable to the pleader.  *SEC v. Sands*, 902 F. Supp.

25  1149, 1165 (C.D. Cal. 1995); *Lazar v. Trans Union LLC*, 195 F.R.D. 665, 669 (C.D. Cal. 2000)

26  (citing *California v. United States*, 512 F. Supp. 36, 39 (N.D. Cal. 1981)).  The central function

27  of a Rule 12(f) motion is "to avoid the expenditure of time and money that must arise from

28  litigating spurious issues by dispensing with those issues prior to trial." *Sidney-Vinstein v. A.H.*

*Robins Co.*, 697 F.2d 880, 885 (9th Cir. 1983).

**C.    Motion for a More Definite Statement**

Under Fed. R. Civ. P. 12(e), "[a] party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response."  Rule 8(a) requires "a short and plain statement" of the basis for relief including grounds for the court's jurisdiction, a statement showing that Plaintiff is entitled to relief, and a demand for the relief sought.  Rule 8(d) requires each allegation to be "simple, concise, and direct."

**III. DISCUSSION**

**A.    Motions to Dismiss**

**1.    Challenges to Count I for subrogation under CERCLA § 112(c)**

Moving Defendants move to dismiss Count I for subrogation under CERCLA § 112(c) on numerous procedural and substantive grounds.

**a.    Jurisdictional challenges**

**i.    Standing[2]**

Section 112(c) provides that any person "who pays compensation *pursuant to this chapter* to any claimant for damages or costs resulting from the release of a hazardous substance shall be subrogated to all rights, claims, and causes of action for such damages and costs of removal *that the claimant has under this chapter or any other law*."  42 U.S.C. § 9612(c)(2) (emphasis added). Ford Motor contends that Chubb lacks standing to bring a Section 112(c) claim because it has not alleged that any payments Chubb made to Taube-Koret constitute "compensation pursuant to" CERCLA.  It argues that an example of a party that would have standing is "an insurance company that settles and pays, on behalf of a potentially responsible party ('PRP') with an insurance policy, claims made by the government in an action brought against the PRP under

----

[2]In addition to the arguments addressed below, Ford Motor contends that Chubb lacks standing to assert a separate claim under CERCLA § 107(a).  While the language of the complaint is ambiguous on this point, it is clear from Chubb's opposition papers that it does not assert an independent Section 107(a) claim in the FAC.  Ford Motor's arguments on this point therefore are moot.

CERCLA Sections 106 or 107(a)."  (Ford Motor Mot. to Dismiss ("MTD") 5.)

Ford Motor points out that the FAC alleges only that Chubb made payments to Taube-Koret "pursuant to the [insurance] Policy, and the Policy obligates Chubb to pay money subject to terms that have nothing to do with CERCLA. . . .  The coverage provisions of the Policy do not even mention CERCLA, much less restrict themselves to payments made 'pursuant to' the statute."  (Ford Motor MTD 6-7.)  Ford Motor argues that the FAC provides no details with respect to the payments Chubb made to Taube-Koret "[o]ther than stating that Taube-Koret made claims for response costs and attorney fees pursuant to the Policy and that Chubb paid those claims."  (*Id.* at 7 (citing FAC ¶¶ 17-18, 72).)

Ford Motor directs the Court's attention to *American International Specialty Lines Insurance Company v. United States*, No. C 04-01591 CRB, 2005 WL 680159, (N.D. Cal. Mar. 24, 2005) ("*AISLIC*").  In that case, the district court determined that the plaintiff insurance company's subrogation claim was not ripe because the company did not allege that it had fully compensated its insured.  *AISLIC*, 2005 WL 680159 at *4.  While Ford Motor concedes that Chubb's Section 112(c) claim is ripe (Ford Reply 4:7-12), it relies on *AISLIC* to argue that Chubb does not have standing to bring a Section 112(c) claim because unlike Chubb, the plaintiff insurance company in that case incurred the response costs itself.  (*See* Ford MTD 6.)  However, Ford Motor also acknowledges that neither the court in *AISLIC* nor the court in *California Department of Toxic Substances Control v. City of Chico*, 297 F. Supp. 2d 1227 (E.D. Cal. 2004), the case relied upon in *AISLIC*, addressed standing.  (Ford Reply 4.)[3]

As argued by Chubb, Ford Motor's interpretation of Section 112(c) is not supported by case authority.  Neither *AISLIC* nor *City of Chico*–nor any other case cited by Ford Motor–stands

_____

[3] Ford Motor also claims that "[t]he difficulty the insurance company plaintiff encountered in the *AISLIC* case was that while it may have had standing to assert a CERCLA § 112(c) claim, it did not in fact allege such a claim, so the issue was never fully before the court." (Ford Reply 3.)  This is incorrect.  The court in *AISLIC* explicitly dismissed the plaintiff insurer's CERCLA subrogation claims for lack of subject matter jurisdiction.  *AISLIC*, 2005 WL 680159, at *4 ("[A]s plaintiff's insured has not been 'made whole,' under federal common law and California law plaintiff's *CERCLA subrogation claims* are not ripe and must be dismissed for lack of subject matter jurisdiction." (emphasis added)).

6

1  for the proposition that a party must incur the response costs *directly* before bringing a CERCLA

2  subrogation claim.  In fact, in rejecting the plaintiff insurer's argument that it could bring a

3  Section 107 claim as a separate basis for recovery following indemnification of its insured, the

4  court in *City of Chico* found that Section 112(c) claims "are the traditional means by which

5  insurance companies may recoup."  *City of Chico*, 297 F. Supp. 2d at 1233.  Moreover, neither

6  *AISLIC* nor *City of Chico* presents an example of the one factual scenario Ford Motor maintains

7  would support a Section 112(c) claim: direct settlement of a Section 106 or 107(a) suit by the

8  insurer with the government on behalf of its insured.

9           Nor does this Court agree with Ford Motor that the plain language of the statute supports

10  its interpretation.  The Court is persuaded by Chubb's argument that Section 113(f)(1) is

11  evidence that Congress knew how to require a prior Section 106 or 107(a) claim with respect to

12  contribution and could have done the same for Section 112 subrogation claims if it so intended.

13  *Compare* Section 112(c)(2) ("Any person . . . *who pays compensation pursuant to this chapter* to

14  any claimant for damages or costs resulting from a release of a hazardous substance shall be

15  subrogated to all rights, claims, and causes of action for such damages and costs of removal that

16  the claimant has under this chapter or any other law." (emphasis added)) *with* Section 113(f)(1)

17  ("Any person may seek contribution from any other person who is liable or potentially liable

18  under section 9607(a) of this title, *during or following any civil action under section 9606 of this*

19  *title or under section 9607(a) of this title*." (emphasis added)).

20           However, while a Section 112(c) plaintiff is not required to show that the compensation it

21  paid relates to a CERCLA claim that already has been resolved through settlement or litigation, a

22  plain reading of Section 112(a) requires plaintiffs to plead that the compensation was paid for

23  damages or costs *resulting from a CERCLA violation*.  While it comes close to doing so, Chubb

24  never explicitly sufficiently "connects the dots" between its payments to its insured under the

25  insurance policy, the costs its insured incurred, and the alleged CERCLA violations.  For this

26  reason, Chubb still has not pled standing to bring its CERCLA subrogation claim under Section

27  112(c).

28

Case No. C 09-4485 JF (PVT)
ORDER GRANTING MOTIONS TO DISMISS WITH LEAVE TO AMEND
(JFLC3)

1

ii.      **Ripeness**[4]

2      In its February 23 Order, the Court concluded that Chubb's claim was not ripe because

3  Chubb had not alleged that its insured had been made whole.  The Court directed Chubb in

4  amending the complaint to "plead with sufficient particularity the circumstances surrounding the

5  compensation it has paid on behalf of Taube-Koret." (Feb. 23 Order at 10.)  Chevron contends

6  that Chubb has failed to do so and that in consequence the claim remains unripe.  While

7  recognizing that the FAC contains a bare allegation that Taube-Koret "has been made whole,"

8  (FAC ¶¶ 8, 18), Chevron argues that this allegation is conclusory and that "the factual allegations

9  in the [FAC] actually demonstrate that Taube-Koret has not been made whole." (Chevron MTD

10  11.)  In particular, Chevron cites Chubb's allegations that the cleanup of Parcel 2 is not complete

11  and that Taube-Koret continues to be damaged by contamination of Parcel 2.  (*See, e.g.*, FAC ¶

12  11 ("[T]he Site has been contaminated by the discharge and release of hazardous substances

13  which are known to be harmful to human health, and resulted in the discharge of hazardous

14  substances into the environment, which *remains and continues to leach throughout the soil and*

15  *groundwater by passive migration*." (emphasis added)).)

16      Chubb asserts that its claim is ripe because it has "fully compensated its insured [Taube-

17  Koret] on its environmental claims made with respect to the remediation costs incurred in

18  complying with the RWQCB Orders." (Chubb Opp'n to Chevron MTD 12.)  It contends that the

19  fact that Taube-Koret neither is a party to this action nor has asserted claims against any other

20  PRPs to recover costs not already paid by Chubb "must be viewed in Chubb's favor." (*Id.*)

21  Chubb also points out that any references to future costs to be incurred by Taube-Koret under

22  CERCLA that appeared in the original complaint have been withdrawn.  With respect to

23  Chevron's argument that the cleanup is incomplete, Chubb argues that "[Taube-Koret's] cleanup

24  efforts were focused on soil removal efforts, not groundwater remediation" and that Chevron

25  "confuses the FAC's allegations regarding the groundwater migration of chemicals released by

26

27          [4]In its opposition to Chevron's motion, Chubb asserts that it has standing to assert Taube-
28  Koret's claims.  However, Chevron contests the ripeness of the claim, not Chubb's standing to
bring the claim.

8

1 the defendant PRPs which remain and serve to support Chubb's allegations regarding nuisance,

2 trespass, and strict liability." (*Id.* at 13 (citing FAC ¶¶ 63, 146, 154, 169).)

3       Chevron contends that it is not enough for Chubb merely to allege payment of claims

4 made by its insured, because "the issue is whether Taube-Koret has been <u>fully</u> compensated for

5 the alleged damages caused by the releases of hazardous substances by the Defendants."

6 (Chevron Reply 5 (citing *City of Chico*, 297 F. Supp. 2d at 1236; *AISLIC*, 2005 WL 680159 at

7 *4; *Sapiano v. Williamsburg Nat. Ins. Co.*, 28 Cal. App. 4th 533, 538 (Cal. Ct. App. 1994))

8 (emphasis in original).)  It argues that Chubb cannot satisfy this requirement while alleging at the

9 same time that contamination is ongoing.  With respect to Chubb's contention that only soil

10 contamination should be considered in determining whether its insured has been made whole,

11 Chevron points out that:

12     The FAC alleges that the soil and groundwater of Parcel 2 remain contaminated.
    FAC ¶¶145, 154.  The FAC alleges that Taube-Koret is being held strictly liable

13     for complying with a Water Board clean up order.  See FAC ¶13.  The only
    reasonable inference is that the Taube-Koret [sic] is still responsible for cleaning

14     up Parcel 2 and will continue to incur cost complying with the Water Board order.
    In addition, if the soil and groundwater remain contaminated as Chubb alleges in

15     its nuisance and trespass claims, then Taube-Koret continues to suffer damages.
    FAC ¶¶145, 154.

16

17 (Chevron Reply 5-6.)

18       Chevron's point is well-taken.  Chubb's conclusory assertion that it has made Taube-

19 Koret whole is insufficient to demonstrate that its subrogation claim is ripe, particularly when

20 that conclusory allegation is contrasted with the FAC's specific allegations of continuing

21 contamination and the continuing obligation of Taube-Koret to participate in remediation and

22 clean-up.  In once again amending the complaint to allege that it has standing, Chubb must allege

23 with particularity, if possible, the status of Taube-Koret's responsibilities regarding

24 contamination at the Site and how the $2.4 million payment from Chubb to Taube-Koret made

25 the latter whole.  If it cannot do so, or if Taube-Koret cannot yet be made whole because of

26 ongoing CERCLA damages, Chubb cannot bring a claim under Section 112(c) at this time.

27

28

1

### iii.    Statute of Limitations

2      CERCLA Section 113(g)(4) provides that claims for subrogation must be brought within

3 three years of the date of the payment of the claim that serves as the basis for subrogation.  42

4 U.S.C. § 613(g)(4).  As Ford Motor points out, the FAC fails to allege when Taube-Koret made

5 its claims or when Chubb paid the claims.  Chubb concedes the absence of such allegations, but

6 it contends that "initial disclosures and discovery would reveal that Chubb paid [Taube-Koret] on

7 its claims on December 4, 2008."  (Chubb Opp'n to Ford Motor MTD 21.)

8      Chubb instituted this action on September 23, 2009.  Accordingly, if Chubb can establish

9 standing and if it paid Taube-Koret's claims before September 23, 2006, the subrogation claim is

10 time-barred.   As the Court noted in its previous order, "[g]enerally, a district court may not

11 consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion."  *Hal Roach*

12 *Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir.1990).  Despite

13 Chubb's representation in its opposition, the FAC contains no allegations establishing that the

14 subrogation claim is timely.  The Court thus must grant Ford Motor's motion on this alternative

15 basis, though it will do so with leave to amend.

16      The Court agrees with the Moving Defendants that Chubb's failures to allege standing,

17 ripeness, and timeliness of the claim each are fatal to Chubb's sole federal claim.  However, the

18 Court is not convinced that amendment would be futile.  Therefore, rather than end its analysis of

19 the issues raised by Moving Defendants at this point, and in the interests of judicial economy and

20 practicality, the Court will address the remaining challenges to Chubb's CERCLA claim.

21          b.      Challenges to the Underlying Section 107(a) Claim[5]

22      Chubb's subrogation claim is based on its allegations that Defendants are jointly and

23 severally liable under CERCLA Section 107(a).  (FAC ¶ 76.)  As the Ninth Circuit has held:

24

25 ────────────────

26      [5]  In addition to its arguments with respect to Section 107(a), Chevron contends that the
FAC fails to state a separate claim under CERCLA § 310(a).  Despite the allegation that "Chubb

27 is a person authorized to commence a civil action against Defendants pursuant to Section 310 of
CERCLA, 42 U.S.C. § 9659," (FAC ¶ 71), it appears from Chubb's opposition papers that it

28 does not assert an independent Section 310(a) claim in the FAC.  Chevron's arguments on this
point therefore are moot.

Case No. C 09-4485 JF (PVT)
ORDER GRANTING MOTIONS TO DISMISS WITH LEAVE TO AMEND
(JFLC3)

1

2    To prevail in a private cost recovery action, a plaintiff must establish that (1) the
     site on which the hazardous substances are contained is a "facility" under
3    CERCLA's definition of that term, Section 101(9), 42 U.S.C. § 9601(9); [footnote
     omitted] (2) a "release" or "threatened release" of any "hazardous substance" from
4    the facility has occurred, 42 U.S.C. § 9607(a)(4); (3) such "release" or "threatened
     release" has caused the plaintiff to incur response costs that were "necessary" and
5    "consistent with the national contingency plan," 42 U.S.C. §§ 9607(a)(4) and
     (a)(4)(B); and (4) the defendant is within one of four classes of persons subject to
6    the liability provisions of Section 107(a).

7    *3550 Stevens Creek Assocs. v. Barclays Bank of Cal.*, 915 F.2d 1355, 1358 (9th Cir. 1990).

8    Moving Defendants each challenge the sufficiency of the FAC's allegations as to at least one of

9    these four requirements.

10                          **i.    Ford Motor's Challenges**

11          Ford Motor contends that the FAC's allegations are insufficient as to the fourth

12   requirement.

13                     **aa.    Liability as an owner or operator**

14          The FAC alleges that Ford Aerospace, a subsidiary of Ford Motor, and not Ford Motor

15   itself, owned and operated a facility at the site. Ford Motor argues that in order to be held liable

16   under CERCLA for the acts of its subsidiary, it must be shown that: "(1) facts exist that would

17   justify piercing the corporate veil; or (2) the parent actively participated in, and exercised control

18   over, the operations of the facility itself such that it can be deemed an operator." (Ford Motor's

19   MTD 8 (citing *United States v. Bestfoods*, 524 U.S. 51, 55 (1998)).) Ford Motor argues that

20   Chubb fails to allege any facts supporting the first prong of this test, and that, with respect to the

21   allegations in Paragraphs 52-53 that Ford Motor is an "operator," the "[a]rticulation of general

22   policies and procedures do [sic] not give rise to direct operator liability under CERCLA." (*Id.* at

23   9 (citing *Bestfoods*, 524 U.S. at 72).)

24          Chubb does not contend that facts alleged in the FAC are sufficient to pierce the

25   corporate veil. Instead, it argues that "Ford Motor is liable to [Taube-Koret] under CERCLA

26   because Chubb has shown that Ford Motor exerted control over the hazardous disposal activities

27   of Ford Aerospace." (Chubb Opp'n to Ford Motor MTD 20.)   It maintains that "Ford Motor's

28   conspicuous involvement in the management of Ford Aerospace's disposal and remediation

                                                    11

1   activities, during and after Ford Aerospace's operation shows that Ford Motor exerted control

2   over the environmental affairs of Ford Aerospace." (Chubb Opp'n to Ford Motor MTD 17.)

3   Chubb also argues that Ford Motor improperly has moved to strike facts from the FAC that

4   support its claims against Ford Motor. (*See* Ford Motor Mot. 18-19 (listing allegations); Chubb

5   Opp'n to Ford Motor MTD 15-17 (same).) The allegations at issue relate to "private indemnity

6   agreements between Ford Motor, Ford Aerospace and/or SS/L, under which Ford Motor

7   allegedly engaged in response activities at the Site." (Ford Motor MTD 18.) Chubb claims that

8   it has alleged facts related to the agreements in order "to show that Ford has taken responsibility

9   for known pollution that has contaminated the Site, not as an attempt to enforce the agreement."

10  (Chubb Opp'n to Ford Motor MTD 20.)

11      Ford Motor contends that "Chubb's allegations simply confirm that Ford Motor's role

12  has only been to facilitate the clean up of releases of hazardous substances caused by others,

13  without any governmental order requiring it to do so." (Ford Motor Reply 7.) It contends that its

14  motion to strike is justified because such allegations are immaterial. Because it will dismiss the

15  FAC with leave to amend, the Court need not address Ford Motor's motion to strike. However,

16  even without striking the challenged allegations, the Court agrees with Ford Motor that under the

17  *Iqbal* standard, Chubb has failed to plead sufficient and specific facts that would support an

18  inference that Ford Motor is liable as an owner or operator through the actions of its subsidiary.

19  Though Chubb does allege specific facts with respect to actions that Ford Motor has taken with

20  respect to remediation and clean-up, none of these facts establishes the requisite control over the

21  actions allegedly taken by Ford Aerospace that serve as the basis for the latter's liability.

22              **bb.    Liability as an "arranger"**

23      Section 107(a)(3) imposes CERCLA liability on

24      any person who by contract, agreement, or otherwise arranged for disposal or
        treatment, or arranged with a transporter for transport for disposal or treatment, of
25      hazardous substances owned or possessed by such person, by any other party or
        entity, at any facility or incineration vessel owned or operated by another party or
26      entity and containing such hazardous substances.

27  42 U.S.C. § 9607(a)(3). Ford Motor claims that it cannot be held liable as an "arranger" under

28  CERCLA because the FAC "is devoid of allegations that Ford Motor arranged for the disposal of

                                            12

its own or anyone else's hazardous waste at the Site." (Ford MTD 12.)  It argues that, if anything, Chubb's allegations show "that the only thing Ford Motor ever did at the Site was attempt to clean it up." (*Id.*)

Chubb contends that its allegations "that Ford Motor arranged for the disposal, transport, and treatment of the hazardous substances released by Ford Aerospace" including Ford Motor's "excavation and removal of 6,000 cubic yards of contaminated soil after Ford Aerospace ceased to exist" establish Ford Motor's liability as an arranger. (Chubb Opp'n to Ford Motor MTD 19 (citing FAC ¶¶ 30, 33, 35, 43, 49-51, 54, 84-87).)  Chubb also claims that arranger liability is established by Ford Motor's control over the ways in which Ford Aerospace dealt with disposing, transporting, and treating certain chemicals.

Chubb relies on the Supreme Court's recent holding that "under the plain language of the statute, an entity may qualify as an arranger under § 9607(a)(3) when it takes intentional steps to dispose of a hazardous substance." *Burlington N. & Santa Fe Ry. Co. v. United States*, 129 S.Ct. 1870, 1878 (2009).  However, as the Court noted in that case, CERCLA "broadly defines ['disposal'] as 'the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water.' 42 U.S.C. § 6903(3)." *Id.*  In large part, Chubb's allegations as to Ford Motor describe removal and remediation efforts that do not meet the statute's definition of "disposal."  The only allegation as to Ford Motor that possibly could meet the statutory definition is that Ford Motor, alone or with Ford Aerospace, installed and maintains a dewatering system and that "[t]he operation of the dewatering system continues to influence on- and off-site contaminated groundwater contamination plumes through portions of the Site causing further VOC contamination to migrate through the Site." (FAC ¶ 35.)  However, Chubb fails to allege how the dewatering system led to costs incurred by Taube-Koret on Parcel 2 for which Chubb compensated Taube-Koret. (*See* Section III.A.1.b.i. below.)

1

**b.    Chevron's Challenges**

2       Chevron challenges the sufficiency of the FAC as to both the third and fourth

3   requirements of a Section 107(a) claim.

4

**i.    Releases from 851 San Antonio Road**

5       Chevron argues that the FAC fails to allege facts sufficient to show that Chubb

6   "incur[red] response costs that were 'necessary' and 'consistent with the national contingency

7   plan,'" as a result of releases from Chevron's former property at 851 San Antonio Road.  In its

8   earlier order, the Court concluded that Chubb's original complaint "fail[ed] to allege any facts

9   that could support an inference connecting the gas station, which is not alleged to have been

10  located within the boundaries of the Site, to the clean-up on the parcel Taube-Koret currently

11  owns."  (Feb. 23 Order at 6.)  Chevron contends that the FAC similarly fails on this point

12  because "[w]hile Chubb alleges in [the FAC] that Chevron owned and operated a gasoline

13  service station at 851 San Antonio Road, and that there were releases of petroleum hydrocarbons

14  and [Polychlorinated Biphenyls ('PCBs')] from this property," Chubb fails to allege "sufficient

15  facts to establish a nexus between Taube Koret's [sic] alleged response costs on Parcel 2 and the

16  alleged release at the former service station."  (Chevron MTD 8.)  Specifically, Chevron argues

17  that the FAC fails to allege that Taube-Koret incurred any response costs for contamination on

18  the site of the service station or for contamination of Parcel 2 that was caused by substances

19  released from the service station while the station was owned and operated Chevron.

20      Chubb contends that many factual allegations in the FAC detail the release of hazardous

21  chemicals during Chevron's operation of the service station between 1960-1977, the spread of

22  hazardous substances that occurred when Chevron demolished the station, and the migration of

23  contamination beyond Chevron's facilities.  (Chubb Opp'n to Chevron MTD 7-8 (citing FAC ¶¶

24  9, 24, 32, 59-63).)  Based on these allegations, Chubb asserts that "a portion of the $2.4 million

25  incurred [by Tabue-Koret] was in response to Chevron's contamination on the Site."  (*Id.* at 8.)

26  Chubb also argues that "based upon the facts, Chevron cannot show that the response costs

27  incurred by [Taube-Koret] did not include costs for Chevron's part in contaminating the soil."

28  (*Id.*)

Case No. C 09-4485 JF (PVT)
ORDER GRANTING MOTIONS TO DISMISS WITH LEAVE TO AMEND
(JFLC3)

1    Chubb argues that Chevron's "nexus" argument is flawed for several other reasons.  First,

2    it contends that the FAC alleges that Chevron actually disposed of hazardous chemicals on the

3    Site.  Second, it contends that CERCLA plaintiffs are not required to show that a particular

4    release caused all of the recoverable response costs.  Finally, it maintains that the focus of the

5    nexus inquiry is "whether the response action is addressed to human health or the environment."

6    *Santa Clara Valley Water District v. Olin Corp.*, 655 F. Supp. 2d 1048, 1057 (N.D. Cal 2009).

7    With respect to this last inquiry, Chubb claims that the allegations in the FAC support the

8    conclusion that "had [Taube-Koret] not performed the necessary remediation and soil removal,

9    future on-Site residents would have been exposed to carcinogenic VOCs and experienced an

10   increased risk to cancer which exceeded the government's target risk goal."  (Chubb Opp'n 10

11   (citing FAC ¶¶ 138-39).)

12       Notwithstanding these arguments, none of the paragraphs in the FAC cited by Chubb,

13   either individually or collectively, establishes that Taube-Koret incurred costs caused by releases

14   from the location of Chevron's former service station.  (*See* FAC ¶¶ 9, 24, 32, 59-63.)  As

15   Chevron points out, Chubb includes allegations in its opposition that do not appear in the FAC.

16   For example, Chubb now claims that "[c]ontamination continued to migrate beyond Chevron's

17   facility as elevated levels of hazardous substances were found on Parcel 2 and determined to be

18   emanating from Chevron's former facility. (FAC, ¶ 32)."  (Chubb Opp'n to Chevron MTD 8.)

19   However, Paragraph 32 of the FAC, as it pertains to Chevron, alleges merely that "[e]levated

20   concentrations of [certain hazardous substances] were observed near and emanating from the

21   former Chevron gasoline service station."  (FAC ¶ 32.)  Chubb may not defeat a motion to

22   dismiss with facts alleged for the first time in its opposition papers.  While the Court must draw

23   reasonable inferences in favor of the non-moving party, such inferences must be based on facts

24   actually alleged in the complaint.  Here, despite the fact that Chubb has amended its complaint in

25   an attempt to include Chevron's former service station within the Site, it still has not alleged

26   sufficient facts to establish that any of the costs it incurred resulted from releases from that

27   section of the Site.

28

15

1

### ii.      Whether Chevron is a Potentially Responsible Party

2

#### aa.      Liability as an "arranger"

3       Like Ford Motor, Chevron argues that Chubb has failed to allege facts demonstrating that

4  Chevron is liable as an "arranger" under CERCLA Section 107(a)(3).  Chevron contends that

5  "there are no factual allegations to support Chubb's legal conclusion that Chevron made an

6  arrangement to dispose of hazardous substances at a facility owned or operated 'by another party

7  or entity.'" (Chevron MTD 10.)

8       Chubb argues that Chevron's legal argument that an owner cannot be held liable as an

9  arranger under CERCLA was rejected by the Ninth Circuit in *Pakootas v. Teck Cominco Metals*,

10  452 F.3d 1066 (9th Cir. 2006).  The defendant owner in *Pakootas* contended that it could not be

11  liable as an arranger because it disposed of its own slag and did not arrange for disposal with

12  another party.  Chubb is correct that the Ninth Circuit rejected this argument.  However, the

13  defendant in *Pakootas*, unlike Chevron here and in clear violation of Section 107(a)(3), disposed

14  of hazardous materials in a "facility" it did not own, the Columbia River.  While *Pakootas* stands

15  for the principle that an owner can be held liable as an arranger where it disposes of waste itself

16  on *another's* property, that principle does not apply here.

17

#### bb.      Liability as an "owner" or "operator"

18       Although it did not not challenge the sufficiency of Chubb's allegations with respect to its

19  liability as an owner in its moving papers, Chevron does so for the first time in its reply.  It is

20  inappropriate to address arguments made in a reply brief without providing the opposing party an

21  opportunity to respond.  Because Chubb will be required to amend its complaint in any event, the

22  Court will defer any discussion of this point.

23

### c.      Sun's Challenges

24       Sun argues that Chubb's allegations against it are insufficient to state a CERCLA claim.

25  It contends that "[t]he only specific factual allegation that can be derived from [the paragraphs

26  specifically pertaining to Sun] is that Sun demolished the vehicle maintenance facility."  (Sun

27  MTD 6.)  Chubb does not allege what kind of hazardous substances allegedly were disposed of

28  by Sun or how Sun used or disposed of such hazardous substances.  According to Sun, "Chubb

Case No. C 09-4485 JF (PVT)
ORDER GRANTING MOTIONS TO DISMISS WITH LEAVE TO AMEND
(JFLC3)

1  admits [that] the hazardous substances had already been released to the environment at this Site

2  when Sun purchased its portion of the property." (*Id.* (citing RWQCB Order No. 89-137, naming

3  Ford Aerospace as the sole discharger).)  Sun relies upon *Carson Harbor Village v. Unocal*

4  *Corp.*, 270 F.3d 863, 874 (9th Cir. 2001), which held that CERCLA liability cannot be imposed

5  if there was no disposal during a defendant's period of ownership.

6          Sun also claims that Chubb "neglects to mention that the referenced orders [of the

7  RWQCB] specifically state that Sun was listed as a discharger because it owns property at the

8  site (as distinguished from Ford Aerospace because 'it is the entity responsible for release of

9  chemicals to the soil and groundwater at the site')."  (Sun MTD 6-7 (citations omitted).)

10  Moreover, "[n]one of the [RWQCB] Orders suggest [sic] that Sun's demolition work in any way

11  contributed to further releases of hazardous substances to the environment," and "[t]here is no

12  indication that Chubb incurred clean up costs from releases of hazardous substances that Sun

13  released if any." (*Id.* at 7.)

14          Chubb argues that Sun is liable as an arranger or as a former owner or operator because

15  Sun "disposed of the contaminated soil and debris at the time of its ownership, by moving and

16  spreading the contaminated soil and debris and arranged for the disposal of contaminated

17  materials." (Chubb Opp'n to Sun MTD 6.)  Chubb contends that *Carson Harbor* is inapposite

18  because the prior landowner in that case "never moved nor disturbed the contaminated soil it

19  owned," while in this case "Chubb has alleged that Sun disposed of hazardous substances by

20  moving and spreading the contaminated soil." (*Id.* at 8-9.)  Chubb also points to the court's

21  observation in *Carson Harbor* that "the movement of contamination that does result from human

22  conduct is a 'disposal.'" *Carson Harbor*, 270 F.3d at 877 (citing *Kaiser Aluminum & Chem.*

23  *Corp.*, 976 F.2d 1338, 1362 (9th Cir. 1992)).  Chubb asserts that the FAC alleges sufficiently that

24  Sun is liable for such disposal as either a past owner or operator or an arranger.

25          While the allegations of the FAC with respect to Sun's role in the release of hazardous

26  substances are more detailed than those involving the other Moving Defendants, they are still

27  insufficient to establish liability.  Among other things, Chubb must provide more details with

28  respect to the type of hazardous substances allegedly released as a result of Sun's activity.

1  Chubb should include such details in any amended pleading.

2      **2.    Challenges to state-law claims**

3  Chubb's CERCLA claim provides the sole basis for federal subject matter jurisdiction.

4  (*See* FAC ¶ 1.)  While federal courts may exercise supplemental jurisdiction over state-law

5  claims "that are so related to claims in the action within [the court's] original jurisdiction that

6  they form part of the same case or controversy under Article III of the United States

7  Constitution," 28 U.S.C. § 1367(a), a court may decline to exercise supplemental jurisdiction

8  where it "has dismissed all claims over which it has original jurisdiction," *id.* § 1367(c)(3).

9  Indeed, unless "considerations of judicial economy, convenience[,] and fairness to litigants"

10 weigh in favor of the exercise of supplemental jurisdiction, "a federal court should hesitate to

11 exercise jurisdiction over state claims."  *United Mine Workers v. Gibbs,* 383 U.S. 715, 726

12 (1966); *see also Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350 (1988) ("[A] federal court

13 should consider and weigh in each case, and at every stage of the litigation, the values of judicial

14 economy, convenience, fairness, and comity.").  Because it is not yet clear that Chubb can state a

15 viable CERCLA claim, the Court will defer its review of the remaining state-law claims.

16 **B.    Motions to Strike Portions of the Complaint and for a More Definite Statement**

17 Because Defendants' motions to dismiss will be granted with leave to amend, the Court

18 need not address Defendants' alternative motions to strike portions of the complaint or for a

19 more definite statement.

20                       **IV. CONCLUSION**

21 For the foregoing reasons, Defendants' motions to dismiss will be granted, with leave to

22 amend in a manner consistent with this order.

23 Any amended complaint shall be filed within thirty (30) days of the date of this order.

24

25 **IT IS SO ORDERED.**

26 DATED: 6/23/10

27

28                   JEREMY FOGEL
                  United States District Judge