1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**E-Filed 12/7/10**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

CHUBB CUSTOM INSURANCE COMPANY, for itself and as the subrogee of, and in the name of TAUBE-KORET CAMPUS FOR JEWISH LIFE,

Plaintiff,

v.

SPACE SYSTEMS/LORAL, INC., et al.,

Defendants.

Case No. 5:09-cv-04485 JF/PVT

**ORDER[1] GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS WITH LEAVE TO AMEND**

[Docket Nos. 107, 108, 112]

Plaintiff Chubb Custom Insurance Company ("Chubb") brings the instant action pursuant to the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq*., as well as various state laws, seeking recovery of costs it incurred on behalf of one if its insureds, the Taube-Koret Campus for Jewish Life ("Taube-Koret"). Chubb alleges that Defendants are jointly and severally liable for these costs, which allegedly were incurred in response to releases or threatened releases of hazardous substances at or near a

---

[1] This disposition is not designated for publication in the official reports.

1  location Taube-Koret currently owns.

2      Defendants Ford Motor Company ("Ford Motor"), Chevron Corporation ("Chevron"),

3  and Harman Stevenson, Inc.[2] ("Stevenson") (collectively "Moving Defendants") move to dismiss

4  or strike portions of Chubb's complaint or, in the alternative, for a more definite statement.  For

5  the reasons discussed below, the motions to dismiss will be granted in part and denied in part,

6  with leave to amend.

7                          **I. BACKGROUND**

8      This action involves a forty-seven-acre site that includes properties located at 3825,

9  3963, and 3977 Fabian Way, and 851 and 901 San Antonio Road in Palo Alto, California.

10  (Second Am. Compl. ("SAC") ¶¶ 14, 17.)  Chubb alleges that Defendant Ford Aerospace &

11  Communications Corporation ("Ford Aerospace") (now known as Defendant Space

12  Systems/Loral, Inc. ("SS/L")) owned and occupied all of the relevant properties except 851 San

13  Antonio Road from approximately 1959 until 1990.  (SAC ¶ 15.)  According to the SAC, Ford

14  Aerospace used these properties to manufacture satellites and satellite equipment.  (*Id.*)  Chubb

15  alleges that Ford Motor was the "controlling entity" of Ford Aerospace until the sale of Ford

16  Aerospace's assets to SS/L in 1990, and that Ford Motor agreed to retain the liabilities of Ford

17  Aerospace as a condition of that sale.  (SAC ¶¶ 52(a), (b).)  It alleges further that SS/L currently

18  occupies all of the property at issue except 901 San Antonio Road.  (SAC ¶ 47.)  Chubb also

19  alleges that in the 1960s, Ford Motor installed a dewatering system beneath 3825 Fabian Way

20  and that Ford Motor continues to operate that system, which extracts groundwater "at an average

21  rate of 70 gallons per minute . . . or 100,800 gallons per day . . . ." (SAC ¶ 55.)  Ford Aerospace

22  allegedly released hazardous substances, (SAC ¶ 40), and the continuing operation of the

23  dewatering system "influenced on- and off-site groundwater contamination plumes, which cased

24  VOCs [volatile organic compounds] to migrate beneath the Site . . . ," (SAC ¶ 55(d).)  Chubb

25  alleges that Ford Aerospace sold 901 San Antonio Road to Defendant Sun Microsystems, Inc.

26

27
      [2]  Harman Stevenson Inc. has changed its name to Harman-Prudence, Inc., (Stevenson's
28  MTD at 2 n.1), but the Court will continue to refer to it as Stevenson for present purposes.

                                    2

1   ("Sun") in 1988.  Finally, Chubb alleges that Sun sold this property to Taube-Koret in June 2002

2   and that Sun was aware of contamination on the property at that time. (SAC ¶ 63.)

3        Chubb also claims that Chevron owned and operated a service station at 851 San Antonio

4   Road between 1960 and 1977, (SAC ¶ 66), and that hazardous substances "including PCBs

5   [polychorinated biphenyls] and petroleum hydrocarbons" were released into the soil on that

6   property in part because of spillage from leaking underground waste-oil storage containers and

7   fuel-line leaks.  (SAC  ¶¶ 67(a)-(e).)  Chubb alleges that Stevenson operated a restaurant at 851

8   San Antonio Road between 1977 and 2007.  (SAC  ¶ 73.)  Chubb further alleges that Stevenson

9   released hazardous substances left by Chevron during the construction and demolition of the

10  restaurant, causing the contamination of previously uncontaminated portions of the property.

11  (SAC  ¶¶ 74, 77.)

12       On June 16, 1999, the California Regional Water Quality Control Board (the "Water

13  Board") issued Order No. 99-043, "which required named dischargers to cleanup and abate the

14  effects of hazardous substances found on certain portions of the Site, namely, 3825, 3963 and

15  3977 Fabian Way and 901 San Antonio Road."  (SAC  ¶ 19.)  On August 12, 2003, following

16  Taube-Koret's acquisition of 901 San Antonio Road, the Water Board issued Order No. R2-

17  2003-0071, which named Taube-Koret as a discharger of hazardous substances, and "based on its

18  status as a current property owner, [Taube-Koret] became liable for complying with [Water

19  Board] Order No. 99-043 . . . ."  (SAC  ¶ 20.)

20       In response, Taube-Koret prepared a risk management plan ("RMP") "for the proposed

21  cleanup and development of [] 901 San Antonio Road."  (SAC  ¶ 22.)  The Water Board

22  approved the RMP, (SAC ¶ 22(c)(ii)), and on March 14, 2007, the Water Board issued Order No.

23  R2-2007-0023, directing Taube-Koret to "implement the RMP pursuant to a time schedule,"

24  (SAC ¶ 24).  Taube-Koret performed various types of soil remediation at 851 and 901 San

25  Antonio Road and installed "vapor control systems to minimize the risk of vapor intrusion

26  [migration of VOCs from the soil to the subsurface]."  (SAC  ¶ 23, 24(d).)  During the

27  excavation of 851 San Antonio Road, Taube-Koret encountered contamination and submitted a

28  "soil removal plan" to the Water Board.  The plan was approved on February 5, 2008.  (SAC  ¶¶

3

1   24(b)(i)-(iv).)  On August 28, 2009, Taube-Koret submitted a report to the Water Board that

2   "demonstrat[ed] compliance with [Water Board] Order No. R2-2007-0023." (SAC ¶ 25.)  On

3   September 9, 2009, the Water Board confirmed that Taube-Koret's actions "satisfied all

4   requirements of the RMP and the RMP Addendum and advis[ed] that the [Water Board] ha[d] no

5   further comments," indicating that Taube-Koret was in compliance with "all [Water Board]

6   [o]rders issued to it . . . ." (SAC ¶ 26.)

7        Chubb previously had issued an insurance policy to Taube-Koret covering the property at

8   issue, and on July 20, 2006, Taube-Koret presented Chubb with a claim for reimbursement of its

9   cleanup costs. (SAC ¶¶ 29-30.)  Although Taube-Koret sought "approximately $3,260,531.98,"

10  Chubb determined that a portion of the claimed costs was the result of development of the

11  property (as opposed to remediation), and it declined to cover both these costs and a portion of

12  Taube-Koret's legal expenses. (SAC ¶ 33(a).)  On December 4, 2008, "Chubb issued a check to

13  [Taube-Koret] in the amount of $2,400,000, representing payment for all necessary [cleanup

14  costs] claimed and incurred by [Taube-Koret]."

15       On September 23, 2009, Chubb filed the instant subrogation action, alleging that

16  Defendants each bear responsibility for the hazardous substances that prompted the Water

17  Board's cleanup orders and seeking recovery of the costs it has incurred on behalf of Taube-

18  Koret. Chubb filed the operative Second Amended Complaint on July 23, 2010, following an

19  order of the Court dated June 23, 2010, which granted various Defendants' respective motions to

20  dismiss with leave to amend.  Moving Defendants filed the instant motions on September 8 and

21  22, 2010.

22                      **II.  LEGAL STANDARD**

23  **A.    Motions to dismiss for failure to state a claim**

24       Dismissal under Fed. R. Civ. P. 12(b)(6) "is appropriate only where the complaint lacks a

25  cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v.*

26  *Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).  For purposes of a motion to

27  dismiss, the plaintiff's allegations are taken as true, and the court must construe the complaint in

28  the light most favorable to the plaintiff. *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969).  At the

4

1  same time, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need

2  detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment]

3  to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of

4  a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)

5  (internal citations omitted).  Thus, a court need not accept as true conclusory allegations,

6  unreasonable inferences, legal characterizations, or unwarranted deductions of fact contained in

7  the complaint.  *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754-755 (9th Cir. 1994).

8  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of

9  misconduct, the complaint has alleged–but it has not 'show[n]'–'that the pleader is entitled to

10  relief.'" *Ashcroft v. Iqbal*, 556 U.S. —, 129 S.Ct. 1937, 1590 (2009) (quoting Fed. R. Civ. P.

11  8(a)(2)).   In addition, a "court may disregard allegations in the complaint if contradicted by facts

12  established by exhibits attached to the complaint." *Sumner Peck Ranch v. Bureau of*

13  *Reclamation*, 823 F. Supp. 715, 720 (E.D. Cal. 1993) (citing *Durning v. First Boston Corp.*, 815

14  F.2d 1265, 1267 (9th Cir.1987)).

15  Leave to amend must be granted unless it is clear that the complaint's deficiencies cannot

16  be cured by amendment.  *Lucas v. Dep't of Corrs.*, 66 F.3d 245, 248 (9th Cir. 1995).  When

17  amendment would be futile, however, dismissal may be ordered with prejudice.  *Dumas v. Kipp,*

18  90 F.3d 386, 393 (9th Cir. 1996).

19  **B.      Motion for a More Definite Statement**

20  Under Fed. R. Civ. P. 12(e), "[a] party may move for a more definite statement of a

21  pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the

22  party cannot reasonably prepare a response."  Rule 8(a) requires "a short and plain statement" of

23  the basis for relief including grounds for the court's jurisdiction, a statement showing that

24  Plaintiff is entitled to relief, and a demand for the relief sought.  Rule 8(d) requires each

25  allegation to be "simple, concise, and direct."

26  **C.      Motions to Strike**

27  Pursuant to Federal Rule of Civil Procedure 12(f), the court may "strike from a pleading

28  an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Where

5

the damages sought in a prayer for relief are not recoverable as a matter of law, a motion to strike may be used to strike the prayer for such damages. *Bureerong v. Uvamas*, 922 F. Supp. 1450, 1479, n.34 (C.D. Cal. 1996) (citing *Tapley v. Lockwood Green Engineers, Inc.*, 502 F.2d. 559, 560 (8th Cir. 1974)); *Wilkerson v. Butler*, 229 F.R.D. 166, 172 (E.D. Cal. 2005).

The grounds for a motion to strike must appear on the face of the complaint, and the court must view the pleading in the light most favorable to the pleader. *SEC v. Sands*, 902 F. Supp. 1149, 1165 (C.D. Cal. 1995); *Lazar v. Trans Union LLC*, 195 F.R.D. 665, 669 (C.D. Cal. 2000) (citing *California v. United States*, 512 F. Supp. 36, 39 (N.D. Cal. 1981)).  The central function of a Rule 12(f) motion is "to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial." *Sidney-Vinstein v. A.H. Robins Co.*, 697 F.2d 880, 885 (9th Cir. 1983).

## III.  MOTIONS TO DISMISS

### A.   Challenges to Chubb's subrogation claim pursuant to CERCLA § 112(c)(2)

Moving Defendants challenge Chubb's CERCLA claim on several levels.  Ford Motor contends that Chubb cannot maintain a subrogation action under CERCLA because Chubb has not alleged that it has paid compensation to a CERCLA "claimant."  All of the Moving Defendants assert that Chubb lacks standing to assert a CERCLA subrogation claim because it has not alleged sufficiently that its payments to Taube-Koret constitute reimbursement of costs incurred pursuant to CERCLA.  Moving Defendants also contend that Chubb's subrogation claim is not ripe because Chubb has not alleged adequately that Taube-Koret has been "made whole,"  and that Chubb has not alleged sufficiently that they are liable for any CERCLA violations on the properties.  Finally, Ford Motor contends that Chubb's CERCLA subrogation claim is time-barred.

### 1.   Whether Chubb can maintain an action for CERCLA subrogation in the absence of a "claim" against the Superfund

42 U.S.C. 9612(c)(2) provides that any person "who pays compensation pursuant to this chapter to any *claimant* for damages or costs resulting from a release of a hazardous substance shall be subrogated to all rights, claims, and causes of actions for such damages and costs of

6

1   removal that the claimant has under this chapter or any other law." (Emphasis added).  Ford

2   Motor argues that even if Chubb's payment to Taube-Koret was "compensation" as defined by

3   CERCLA, Chubb has not alleged that Taube-Koret is a "claimant" for purposes of § 112(c)(2).

4   "The term 'claimant' means any person who presents a claim for compensation under this

5   Act."  42 U.S.C. 9601(5)  "A 'claim' consistently refers to a demand for reimbursement from the

6   Superfund,[3] except for its first appearance in the second sentence of section 112(a), where it

7   refers more generally 'to a pre-claim/pre-action demand to the liable party.'"  *Howmet*, 814 F.2d

8   at 1380 (quoting *Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 805 F.2d 1074, 1079 (1st

9   Cir. 1986)).  Thus, for purposes of CERCLA §§ 101 and 112, an entity may be a "claimant"

10  either by demanding reimbursement from the Superfund or demanding reimbursement from the

11  liable party before presenting such a demand to the Superfund.  Here, Chubb does not allege that

12  Taube-Koret has presented a demand either to the Superfund or to a liable party.  Instead, Taube-

13  Koret's insurer, Chubb, has presented a demand to Moving Defendants and others.  Chubb does

14  not allege facts establishing that Taube-Koret is a "claimant" for purposes of § 112(c)(2).

15  Because CERCLA does not provide a mechanism other than § 112(c)(2) for statutory

16  subrogation of a CERCLA claim, Chubb's allegations do not support a claim that Chubb is the

17  subrogee of Taube-Koret's rights pursuant to § 112(c)(2).  However, this does not mean that

18  Chubb cannot pursue a subrogation claim under other laws.  For example, CERCLA § 107(a)

19  establishes a right of action between a party that directly incurs response costs and the parties

20  responsible for the contamination.  42 U.S.C. § 9607(a).  While CERCLA § 107(e)(1) "provides

21  that a person who may be liable for a release under CERCLA may not transfer to any other

22  person his or her liability pursuant to an indemnification or any other agreement," CERCLA

23  Section 107(e)(2) "clarifies that (e)(1) does not bar a person liable under CERCLA or a guarantor

24  from bringing subrogation actions."  *Cal. Dep't of Toxic Substances Control v. City of Chico,*

25  297 F. Supp. 2d 1227, 1236 n.12 (E.D. Cal. 2004).  Thus, while it has not shown that Taube-

26

27          [3]  The "Superfund" is "a trust fund [created by CERCLA] against which parties who

28  undertake cleanups could assert claims for their costs and for damages to natural resources."
    *Idaho v. Howmet Turbine Component Co.*, 814 F.2d 1376, 1378 (9th Cir. 1987).

1  Koret is a "claimant" for purposes of CERCLA § 112(c)(2), Chubb is not barred entirely from

2  asserting a right to subrogation if it can state a claim based on some other law, such as a

3  contractual claim governed by state law.

4      **2.    Standing**

5      As explained above, CERCLA § 112(c)(2) provides that any person "who pays

6  compensation pursuant to this chapter to any claimant for damages or costs resulting from a

7  release of a hazardous substance shall be subrogated to all rights, claims, and causes of actions

8  for such damages and costs of removal *that the claimant has under this chapter or any other*

9  *law*." 42 U.S.C. § 112(c)(2) (emphasis added).  Moving Defendants contend that Chubb lacks

10 standing to assert a CERCLA claim.  In its opposition papers, Chubb focuses on facts that could

11 support a finding that Moving Defendants caused the contamination on Taube-Koret's property.

12 However, the issue is whether Chubb has alleged sufficiently that the payment to Taube-Koret

13 reimbursed costs incurred pursuant to CERCLA.

14     In relevant part, covered persons are liable under CERCLA for "all costs of removal or

15 remedial action incurred by the United States Government or a State or an Indian tribe not

16 inconsistent with the national contingency plan" and "any other *necessary costs* of response

17 incurred by any other person *consistent with the national contingency plan*."  42 U.S.C.

18 9607(a)(4)(A)-(B) (emphasis added).  Chubb alleges that Taube-Koret, in responding to Water

19 Board Order Nos. 99-043 and R2-2003-0071, performed remedial and removal actions that

20 "were necessary and consistent with the [n]ational [c]ontingency [p]lan . . . ."  (SAC ¶ 21.)

21 Moving Defendants argue that standing cannot be established by bare assertions.

22      **a.    Whether Taube-Koret's costs were "necessary"**

23     With respect to 901 San Antonio Road, Ford Motor argues that the costs incurred by

24 Taube-Koret were not "necessary" because the Water Board's orders applied to several other

25 entities and because the costs were incurred only because Taube-Koret sought to develop the site.

26 However, Chubb alleges that the Water Board orders *required* that 901 San Antonio Road be

27 remediated, irrespective of Taube-Koret's plans for development.  Moreover, Chubb alleges that

28 while the orders did not require specifically that Taube-Koret – as opposed to the other named

8

1   dischargers – pay for the remediation efforts, the Water Board's orders rendered all of the named

2   dischargers liable for the remediation of the site.  (SAC ¶ 19.)  Whether Taube-Koret or another

3   of the named discharges paid for the cleanup, Chubb alleges sufficiently that remediation of 901

4   San Antonio Road was required, and Ford Motor does not contend that the cleanup activities for

5   which Chubb seeks reimbursement were superfluous or extraneous to efforts that were

6   "necessary" to comply with the Water Board's order to "cleanup and abate" the contamination.

7          That said, Chubb does not allege that any order of the Water Board required Taube-Koret

8   to remediate 851 San Antonio Road.  Indeed, Chubb alleges that the Water Board's orders

9   concerned *only* 901 San Antonio Road.  (SAC ¶ 19.)  While the Water Board apparently

10   approved some type of a remediation plan for 851 San Antonio Road, (SAC ¶ 24(b)(iv)), it is

11   unclear whether compliance with that plan was "necessary."

12              **b.      Whether Taube-Koret's costs were "consistent with the national**

13                        **contingency plan"**

14          Chubb alleges that the Water Board approved the RMP for 901 San Antonio Road as a

15   remediation plan.  (SAC ¶ 22(c)(ii).)  Cal. Health & Safety Code § 33459.1(b)(2) provides

16   essentially that once the Water Board has identified a responsible party, the Water Board may

17   accept a responsible party's "plan and schedule to remedy or remove the release [of hazardous

18   materials]" if the plan is "found by the agency to be consistent, to the maximum extent possible,

19   with the priorities, guidelines, criteria, and regulations contained in the National Contingency

20   Plan . . . ."  Accordingly, Chubb's allegations are sufficient to support a reasonable inference that

21   Taube-Koret's response costs with respect to 901 San Antonio Road – incurred in complying

22   with the RMP approved by the Water Board – are consistent with the national contingency plan.

23          However, Chubb's allegations with respect to 851 San Antonio Road are insufficient.  In

24   particular, Chubb does not allege that the Water Board identified Taube-Koret as a responsible

25   party with respect to the contamination or specify the statutory authority pursuant to which the

26   Water Board approved the remediation plan for that parcel.  Accordingly, the facts alleged are

27   insufficient to support an inference that the Water Board's approval of a remediation plan for 851

28   San Antonio Road was made pursuant to Cal. Health & Safety Code 33459.1(b)(2) or that Taube-

9

1    Koret's remediation plan for 851 San Antonio Road otherwise was consistent with the national

2    contingency plan.

3         **3.    Ripeness**

4         Moving Defendants also claim that Taube-Koret has not been "made whole" with respect

5    to its obligations to remediate 851 and 901 San Antonio Road.  This Court previously concluded

6    that under federal common law, a subrogation claim is not ripe until the insured has been "made

7    whole."  *See Copeland Oaks v. Haupt*, 209 F.3d 811, 813 (6th Cir. 2000) (noting that "the

8    so-called 'make whole' rule of federal common law [] requires that an insured be made whole

9    before an insurer can enforce its right to subrogation under ERISA, unless there is a clear

10   contractual provision to the contrary."); *Cal. Dep't of Toxic Substances Control v. City of Chico*,

11   297 F. Supp. 2d 1227, 1236 (E.D. Cal. 2004).

12        **a.    Soil remediation efforts**

13        With respect to soil remediation at 901 San Antonio Road, Ford Motor argues that even if

14   Taube-Koret has complied fully with Order No. R2-2007-0023, that order is separate from Order

15   No. 99-043, and Chubb has not alleged sufficiently that Taube-Koret complied fully with Order

16   No. 99-043.  This argument is unpersuasive.  Taube-Koret prepared the RMP in response to

17   Order No. 99-043.  (SAC ¶ 22.)  The RMP was submitted to the Water Board, and the Water

18   Board issued Order No. R2-2007-0023, directing Taube-Koret to implement the RMP.  For

19   purposes of the instant motion, Chubb's allegations are sufficient to support a reasonable

20   inference that by issuing Order No. R2-2007-0023, the Water Board found the RMP to be

21   sufficient to resolve Order No. 99-043, and that Order No. 99-043 was resolved when the Water

22   Board determined that Taube-Koret had complied with Order No. R2-2007-0023.

23        Chevron contends that Taube-Koret has not fully remediated the contaminated soil at 851

24   San Antonio Road, noting that Chubb alleges that contamination was present at several locations

25   on that property.  (SAC ¶¶ 67(b) (alleging that an oil spill occurred "near the western portion" of

26   the property), 67(b) (alleging that a petroleum leak occurred "near the souther portion" of the

27   property), 71 (alleging contamination located at the "southeastern corner" of the property), 68

28   (alleging that Chevron "spread and moved contaminated soil onto uncontaminated areas), 77

                                               10

1    (alleging that Stevenson "spread and moved contaminated soil onto uncontaminated areas.").)

2    Pointing to paragraph 24(b) of the SAC, Chevron argues that Taube-Koret remediated soil only

3    at the "southeastern corner" of the property.  Chubb alleges that Taube-Koret submitted a plan to

4    the Water Board, proposing to "removal *all* soil exceeding ESLs [environmental screening

5    levels] to a depth of 10 feet," and that Water Board approved this plan.  (SAC 24(b)(iv)

6    (emphasis added).)  However, it is not clear that Taube-Koret complied with this plan.  While

7    Chubb alleges that Taube-Koret "compli[ed] with the RMP and the RMP Addendum and

8    demonstrat[ed] full compliance with [Water Board] Order No. R2-2007-0023," (SAC 25), it does

9    not allege that 851 San Antonio Road was the subject of any orders from the Water Board or that

10   the soil remediation plan for 851 San Antonio Road was included within the "RMP" or the

11   "RMP Addendum."

12        Moreover, while Chubb claims that on July 20, 2006, Taube-Koret submitted a claim "for

13   the reimbursement of the Response Costs described in paragraphs 21 to 28 [of the SAC]," (SAC

14   ¶ 30), paragraph 24 describes remediation activities on 851 San Antonio Road that occurred *after*

15   July 20, 2006.  It is not clear that Taube-Koret ever has submitted a claim for remediation costs

16   at 851 San Antonio Road.

17                    **b.    Groundwater remediation**

18        While Chevron and Stevenson contend that Taube-Koret faces ongoing liability for

19   groundwater contamination, the SAC does not allege that groundwater is causing contamination

20   at 851 San Antonio Road.  Chubb's allegations with respect to 851 San Antonio Road focus on

21   contaminated soil and underground waste oil storage tanks.  (SAC ¶ 24(b)-(c).)  While it claims

22   that Taube-Koret encountered groundwater beneath 851 San Antonio Road, (SAC ¶ 24(b)(i)-(ii)),

23   Chubb does not allege that the groundwater continues to be contaminated following soil

24   remediation and removal of the storage tanks.  Nor does Chubb allege that Ford Motor's

25   dewatering system causes contaminated groundwater from other locations to migrate onto 851

26   San Antonio Road.  The Court must accept Chubb's factual assertions for purposes of the present

27   motion.

28        In contrast, it is clear from Chubb's own allegations that the groundwater at 901 San

                                          11

Antonio Road remains contaminated.  (SAC ¶ 55.)  Chubb contends that the Water Board did not require any groundwater remediation, requiring only that the named dischargers, including Taube-Koret, "cleanup and abate the effects of hazardous substances found on certain portions of . . . 901 San Antonio Road."  (SAC ¶ 19.)  Chubb alleges that it developed an RMP "for the proposed cleanup and development of . . . 901 San Antonio Road," (SAC ¶ 7), and the Water Board approved the plan.  Taube-Koret subsequently removed and remediated soil from 901 San Antonio Road and installed vapor control systems "in order to minimize the risk of vapor intrusion [of the hazardous materials into the surface of the property.]" (SAC ¶ 24(d).)  It is unclear whether the vapor control system was installed at 901 San Antonio Road, 851 San Antonio Road, or both.

Although the Water Board subsequently confirmed that Taube-Koret had complied with the RMP, (SAC ¶ 26), Ford Motor argues that Taube-Koret has not satisfied its liability with respect to the Water Board's orders to "cleanup and abate the effects of hazardous substances" at 901 San Antonio Road because the dewatering system continues to operate, (SAC ¶ 55), and will continue to cause VOC contamination to migrate onto Taube-Koret's property, (SAC ¶ 55(d)). However, Chubb alleges that "the risk management measures and monitoring described in the RMP provided a significant margin of safety to protect future residents, *even if VOC concentrations in groundwater and soil gas increased at the property due to the mitigation of hazardous substances from upgradient sites in the future*."  (SAC ¶ 22(c)(I) (emphasis added).) Chubb does not explain the scope of the "monitoring" described in the RMP, but viewing the allegations of the SAC in the light most favorable to Chubb, such monitoring does not appear to require Taube-Koret to incur anything beyond *de minimis* costs.

### 4. Whether Chubb's substantive allegations are sufficient to state a claim that Moving Defendants are liable for Taube-Koret's clean-up costs

"To prevail in a private cost recovery action, a plaintiff must establish that (1) the site on which the hazardous substances are contained is a 'facility' under CERCLA's definition of that term, Section 101(9), 42 U.S.C. § 9601(9); (2) a 'release' or 'threatened release' of any 'hazardous substance' from the facility has occurred, 42 U.S.C. § 9607(a)(4); (3) such 'release'

12

or 'threatened release' has caused the plaintiff to incur response costs that were 'necessary' and 'consistent with the national contingency plan,' 42 U.S.C. §§ 9607(a)(4) and (a)(4)(B); and (4) the defendant is within one of four classes of persons subject to the liability provisions of Section 107(a)." *3550 Stevens Creek Assocs. v. Barclays Bank*, 915 F.2d 1355, 1358 (9th Cir. 1990) (citing *Ascon Properties, Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1152 (9th Cir. 1989)).

### a.   Ford Motor's liability

Ford Motor contends that Chubb's allegations are insufficient to show that Ford Motor is "within one of four classes of persons subject to the liability provisions of Section 107(a)." *3550 Stevens Creek Assocs.*, 915 F.2d at 1358. Chubb argues that its allegations are sufficient to support a reasonable inference that Ford Motor is liable as an "owner or operator" of the Ford Aerospace facility, 42 U.S.C. § 9607(a)(1), and as an arranger of the disposal of hazardous substances owned by Ford Aerospace, 42 U.S.C. § 9607(a)(3).

### i.   Owner or operator liability

Chubb claims that Ford Motor "exercised actual management and control over the operations of Ford Aerospace and its facilities . . . ." (SAC ¶ 53.) "'Activities that involve the facility but which are consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures, should not give rise to direct liability.' [Citation] The critical question is whether, in degree and detail, actions directed to the facility by an agent of the parent alone are eccentric under accepted norms of parental oversight of a subsidiary's facility." *United States v. Bestfoods*, 524 U.S. 51, 72 (U.S. 1998) (quoting Oswald, *Bifurcation of the Owner and Operator Analysis under CERCLA*, 72 WASH. U. L. Q. 223, 282 (1994)). *Bestfoods* provides an example of the type of behavior that is sufficient to create liability. In that case, an individual employed solely by the parent corporation issued directives regarding the subsidiary's responses to regulatory inquiries and participated actively in a variety of the subsidiary's environmental matters. *Id.* at 62.

While Chubb alleges that Ford Motor was involved directly in Ford Aerospace's responses to regulatory inquiries and participated actively in Ford Aerospace's environmental

13

1   activities, (SAC ¶ 53(a)-(h)), this Court previously found substantially similar allegations to be

2   insufficient to support a claim.  Chubb now alleges "on information and belief" that Ford Motor

3   inserted itself into Ford Aerospace's environmental affairs, but it still has not provided factual

4   support for its conclusory assertions that Ford Motor's office of general counsel "exercised

5   management and control over Ford Aerospace's compliance with environmental laws and

6   regulations," or that "Ford Motor required Ford Aerospace's management to immediately direct

7   all communications from government agencies regarding environmental matters to [Ford Motor's

8   office of general counsel.]" (SAC ¶ 53.)

9        Chubb claims that Ford Motor agreed to retain the liabilities of Ford Aerospace when it

10   sold Ford Aerospace's assets in 1990, (SAC ¶ 54(d)), and it asserts that such an agreement is

11   evidence of Ford Motor's eccentric activities with respect to its subsidiary's environmental

12   matters.  However, even accepting as true the allegation that Ford Motor entered into an

13   agreement to be liable for its subsidiary's environmental responsibilities, the existence of such an

14   agreement does not establish that Ford Motor actually was involved in Ford Aerospace's

15   environmental affairs.

16        CERCLA § 107(a) does not extend coverage to persons who agree merely to be

17   contractually liable for the actions of covered persons.  Moreover, while it is conceivable that

18   some entity could seek to enforce the alleged agreement to hold Ford Motor liable for

19   contamination allegedly caused by Ford Aerospace, Chubb itself does not claim a right to enforce

20   that agreement.  Chubb does not allege that it is a party, an intended third-party beneficiary, or a

21   tranferee of the rights under the agreement.

22               **ii.    Arranger liability**

23        Chubb alleges that in the 1960s, Ford Motor – not Ford Aerospace – installed a

24   dewatering system beneath 3825 Fabian Way to extract groundwater.  (SAC ¶ 55.)  The purpose

25   of the dewatering system was to control water levels in a basement of a building located on the

26   parcel.  (SAC ¶ 55(a).)  Ford Motor "later" implemented a "groundwater treatment method

27   through the use of its dewatering system to pump and discharge water."  (SAC ¶ 55(b).)  Chubb

28   asserts that the dewatering system "influenced on- and off-site groundwater contamination

14

1    plumes, which caused VOCs to migrate beneath the Site, resulting in the contamination of

2    [Taube-Koret]'s [p]roperty."  (SAC ¶ 55(d).)  As discussed in the Court's previous order, "under

3    the plain language of the statute, an entity may qualify as an arranger under § 9607(a)(3) when it

4    takes intentional steps to dispose of a hazardous substance," *Burlington N. & Santa Fe Ry. Co. v.*

5    *United States*, 129 S.Ct. 1870, 1878 (2009), and CERCLA "broadly defines ['disposal'] as 'the

6    discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or

7    hazardous waste into or on any land or water," *id*. (quoting 42 U.S.C. § 9603(3)).

8         Chubb alleges that Ford Motor installed, maintained, and operated the dewatering system,

9    implemented a groundwater treatment method, and discharged the dewatering system's effluent

10   into a storm drain on Fabian Way.  (SAC ¶¶ 55(a)-(e).)  The Court previously found similar

11   allegations to be insufficient because "Chubb fail[ed] to allege how the dewatering system led to

12   costs incurred by Taube-Koret on [901 San Antonio Road] for which Chubb compensated Taube-

13   Koret."  *Chubb Custom Ins. Co. v. Space Systems/Loral, Inc., et al.*, No. C 09-4485 JF (PVT),

14   2010 WL 2573386, at *8 (N.D. Cal. June 23, 2010).  Chubb now alleges that the dewatering

15   system extracts 100,800 gallons of water per day, (SAC ¶ 55), and that the volume of water

16   extracted has caused other contaminated groundwater to migrate through previously

17   uncontaminated areas beneath Taube-Koret's property, (SAC ¶ 55(g)), causing Taube-Koret to

18   incur additional expenses in cleaning up the site.

19        Ford Motor contends that the operation of the dewatering system and resulting migration

20   of groundwater underneath Taube-Koret's property do not amount to "intentional" "disposal."

21   However, as alleged, the implementation of the treatment method through the dewatering system

22   is an intentional step to treat and deposit the contaminated groundwater, and the volume of

23   extracted water allegedly caused hazardous materials to "leak" onto previously uncontaminated

24   soil, activities that are encompassed within the definition of "disposal" articulated in *Burlington*,

25   129 S. Ct. at 1878.

26        Finally, Ford Motor contends that Chubb's allegations with respect to the dewatering

27   system are insufficient because the allegations do not establish that the "implementation of [Ford

28   Motor's] dewatering and other environmental remediation activities constitute operation of a

15

1  'facility' . . . ." (Ford Motor's MTD at 10:11-12.) CERCLA § 101(9) provides that "[t]he term

2  'facility' means (A) any building, structure, installation, equipment, pipe or pipeline (including

3  any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment,

4  ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area

5  where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise

6  come to be located; but does not include any consumer product in consumer use or any vessel."

7  42 U.S.C. § 9601(9). As alleged, the dewatering system is equipment in which a hazardous

8  substance has come to be located. Accordingly, Chubb's allegations are sufficient to support a

9  reasonable inference that Ford Motor is an arranger for purposes of CERCLA § 107(a)(3).

10  **b.    Chevron's and Stevenson's liability**

11  Chevron and Stevenson contend that Chubb's allegations are insufficient to support a

12  reasonable inference that they are liable for a CERCLA violation because the release of

13  petroleum hydrocarbons is exempt from CERCLA liability. Chevron also contends that Taube-

14  Koret's insurance policy with Chubb excludes reimbursement for cleanup costs associated with

15  the contamination found at 851 San Antonio Road. With respect to the latter contention,

16  Chevron contends that none of the money paid from Chubb to Taube-Koret could be associated

17  with a CERCLA violation at 851 San Antonio Road because the insurance policy excludes from

18  coverage the "[p]ollution incident associated with former UST(s) [underground storage tank(s)]

19  and product lines at the 851 San Antonio Road property . . . ." (SAC, Ex. A at 46.) If in fact the

20  insurance policy excludes coverage for the contamination at 851 San Antonio Road, then Chubb

21  has not alleged sufficiently that its payment to Taube-Koret is the result of contamination at that

22  site for which Chevron or Stevenson could be liable. However, Chubb claims that some of the

23  contamination at 851 San Antonio Road resulted from "[a]ccidental spills occurr[ing] during the

24  handling and filling of fuel," (SAC ¶ 67(c)), which is related neither to the storage tanks nor to

25  the fuel lines.

26  Chevron argues persuasively that the substances alleged to contaminate 851 San Antonio

27  Road are not "hazardous" for purposes of CERCLA. In defining the term "hazardous substance,"

28  42 U.S.C. § 9601(14) provides that "[t]he term does not include petroleum, including crude oil or

16

1  any fraction thereof which is not otherwise specifically listed or designated as a hazardous

2  substance under subparagraphs (A) through (F) of this paragraph."  Chubb alleges that 851 San

3  Antonio Road was contaminated by "VOCs . . . associated with heavy-end petroleum releases,"

4  (SAC ¶ 24(b)(iii)), "petroleum hydrocarbons and PCBs [polychorinated biphenyls,]" (SAC ¶

5  24(b)(vii), and "diesel and motor oil range hydrocarbons, oil and grease, and metals (cadmium,

6  chromium, lead, nickel, and zinc)," (SAC ¶ 24(c)(iii)).  California's Hazardous Substances

7  Account Act includes a petroleum exclusion with language that tracks the language used in

8  CERCLA, providing that the term "hazardous substance" does not include "[p]etroleum,

9  including crude oil or any fraction thereof which is not otherwise specifically listed or designated

10 as a hazardous substance. . . ." Cal. Health & Safety Code § 25317.

11      Chubb alleges that motor or hydraulic oil produced before the late 1970s is the source of

12 the PCB contamination.  (SAC ¶ 24(b)(iii) (alleging that "the distribution of PCBs suggested . . .

13 an undocumented release of motor or hydraulic oil manufactured prior to the ban on the use of

14 PCBs in these oils in the late 1970s . . . .").)  As interpreted by the Ninth Circuit, "the petroleum

15 exclusion in CERCLA does apply to unrefined and refined gasoline even though certain of its

16 indigenous components and certain additives during the refining process have themselves been

17 designated as hazardous substances within the meaning of CERCLA." *Wilshire Westwood*

18 *Assocs. v. Atlantic Richfield Corp.*, 881 F.2d 801, 810 (9th Cir. 1989).  While the facts in

19 *Wilshire* appear to have involved indigenous components of petroleum products, the holding in

20 that case refers expressly to "additives," resulting in the application of the petroleum exclusion to

21 PCBs found in oils and the remaining contaminants allegedly found at 851 San Antonio Road.

22 Accordingly, because the petroleum exclusion applies to refined petroleum products and its

23 additives, Chubb's allegations are insufficient to support an inference that either Chevron or

24 Stevenson is responsible for a "release" of a hazardous substance at 851 San Antonio Road.

25          **5.      Whether Chubb's CERCLA subrogation claim is time-barred**

26      Ford Motor contends that Chubb's § 112(c)(2) claim is time-barred and that the defect

27 cannot be cured by amendment.  42 U.S.C. § 9613(g)(4) provides that "[n]o action based on

28 rights subrogated pursuant to this section by reason of payment of a claim may be commenced

17

1    under this title [42 U.S.C. §§ 9601 *et seq.*] more than 3 years after the date of payment of such

2    claim."  Chubb alleges that it paid Taube-Koret's claim on December 8, 2008, (SAC ¶ 26); it

3    brought the instant action on September 23, 2009.

4            However, Ford Motor points out that under 42 U.S.C. § 9613(g)(2)(A), a claim to recover

5    costs for a "removal action" must be brought within three years after the completion of that

6    action.  Chubb seeks to recover the costs incurred by Taube-Koret at 901 San Antonio Road in

7    June and July 2006, costs that Chubb concedes relate to a "removal action." (SAC ¶ 85(a)).  Ford

8    Motor contends that because the removal action was completed in July 2006, (SAC ¶ 23(a)),

9    Chubb's subrogation claim cannot be sustained because at least under California law, "an insurer

10   cannot acquire by subrogation anything to which the insured has no rights, and may claim no

11   rights which the insured does not have."  *Low v. Golden Eagle Ins. Co. et al.*, 101 Cal. App. 4th

12   1354, 1362 (2002).

13           As discussed above, Moving Defendants assert that Taube-Koret faces ongoing liability

14   for cleanup costs associated with 851 and 901 San Antonio Road.  If Taube-Koret has not

15   "completed" the removal action, the limitations period under § 113(g)(2)(A) has not started to

16   run.  Moreover, Chubb's claim appears to be timely even if Taube-Koret's removal action has

17   been completed.  Pursuant to 42 U.S.C. 9613(g)(2)(B), an entity may recover the costs incurred

18   in connection with a removal action within nine years of the completion of the action provided

19   that the entity initiates remedial action within three years of the completion of the removal action

20   and files suit within six years thereafter.

21           Chubb alleges that in addition to simply removing contaminated soil in June and July

22   2006, (SAC ¶ 23(a)), Taube-Koret also "remediated" soils at 901 San Antonio Road to "[Water

23   Board] approved levels," (SAC ¶ 23(b)), and installed "vapor control systems in order to

24   minimize the risk of vapor intrusion," (SAC ¶ 24(d)).  (*See also* SAC ¶ 85(a) (alleging that

25   Taube-Koret incurred response costs in connection with "performing remedial action[,] operation

26   and maintenance.")  Based upon the submission of Taube-Koret's claim to Chubb on July 20,

27   2006 and Taube-Koret's compliance with Order No. R2-2007-0023 by September 9, 2009, it

28   appears that the remedial action was initiated within three years of the completion of the removal

1    action and within six years of Chubb's filing of the instant legal action.

2    **B.    Challenges to Chubb's state-law claims**

3         Chubb asserts state-law claims for contractual subrogation, equitable subrogation,

4    statutory indemnity, negligence per se, and strict liability.

5         **1.    Contractual subrogation**

6         The insurance policy between Chubb and Taube-Koret provides that "[i]f the insured

7    [Taube-Koret] has rights to recover all or part of any payment we have made under this

8    insurance, those rights are transferred to us [Chubb]." (SAC, Ex. A at 15.)  This claim

9    previously was dismissed because Chubb had not alleged facts that could support a reasonable

10   inference that Taube-Koret incurred response costs or that Defendants were liable under

11   CERCLA.  *Chubb Custom Ins. Co. v. Space Systems/Loral, Inc.*, No. C 09-4485 JF (PVT), 2010

12   WL 689940, at *8 (N.D. Cal. Feb. 23, 2010).  At least with respect to Ford Motor and the parcel

13   at 901 San Antonio Road, that defect has been cured in the operative pleading.  However, as

14   discussed above, Chubb's allegations with respect to 851 San Antonio Road are insufficient to

15   support a reasonable inference that Chubb incurred response costs pursuant to CERCLA or that

16   Chevron and Stevenson are liable for a CERCLA violation.

17        **2.    Equitable subrogation**

18        To support a claim for equitable subrogation, Chubb must allege sufficiently that:

19        (1) the insured suffered a loss for which the defendant is liable, either (a) because
          the defendant is a wrongdoer whose act or omission caused the loss or (b)
20        because the defendant is legally responsible to the insured for the loss caused by
          the wrongdoer; (2) the insurer has compensated the insured for the loss for which
21        the defendant is liable; (3) the insured has an existing, assignable cause of action
          against the defendant which the insured could have asserted had it not been
22        compensated by the insurer; (4) the insurer has suffered damages caused by the
          act or omission upon which the liability of the defendant depends; (5) justice
23        requires that the loss should be shifted from the insurer to the defendant, whose
          equitable position is inferior to that of the insurer; and (6) the insurer's damages
24        are in a stated sum, usually the amount paid to its insured.

25   *Fireman's Fund Ins. Co. v. Wilshire Film Ventures*, 52 Cal. App. 4th 553, 555-56 (Cal. App. 2d

26   Dist. 1997).  As discussed above, Chubb's allegations with respect to Ford Motor and 901 San

27   Antonio Road are sufficient to establish all of the *Fireman's Fund* factors for except for the third

28   factor, which is addressed below.  However, as with its claim for contractual subrogation, Chubb

                                              19

1    has not alleged sufficiently that Chevron or Stevenson is liable for a CERCLA violation and that

2    the majority of the *Fireman's Fund* factors are present.

3        **3.    Statutory indemnity**

4        The Court previously dismissed Chubb's statutory indemnity claim with respect to Ford

5    Motor but granted leave to amend because "Chubb may be able to plead additional facts

6    sufficient to satisfy *Iqbal* and *Twombly* as to at least one CERCLA claim in an amended

7    pleading." *Chubb*, 2010 WL 689940, at *8.  As discussed above, the operative pleading does

8    allege facts sufficient to support a reasonable inference that Ford Motor is liable for a CERCLA

9    violation.  However, as with Chubb's other state-law claims, the allegations in the SAC are

10   insufficient to support a similar inference against Chevron and Stevenson.

11       Moreover, Chevron cannot be liable for a violation of Cal. Health & Safety Code

12   25363(e) because the statute is not retroactive and became effective only after January 1, 1982.

13   Chubb alleges that Chevron ceased operations at 851 San Antonio Road in 1977 when it sold the

14   property.  (SAC ¶ 66.)  Chubb nonetheless claims that Chevron still may be liable because it left

15   conditions on the property, such as underground waste oil storage containers, that caused the

16   migration of hazardous substances onto the property after 1982.  However, accepting Chubb's

17   argument would eviscerate the statute's express language precluding retroactive application.

18       Under Cal. Health & Safety Code § 25366(a), liability may be imposed for acts that

19   occurred on or before January 1, 1982 if the acts violated existing state or federal laws at the time

20   they occurred.  Chubb alleges conclusorily that Chevron has violated other state and federal laws.

21   (SAC ¶ 137.)  Chubb relies upon pre-*Twombly* and pre-*Iqbal* precedent for the proposition that

22   "'[n]otice pleading does not require that [a plaintiff] specifically allege that [] acts violated

23   existing state or federal laws or identify such laws," *City of Rialto v. U.S. Dept. of Defense*, *et al.*,

24   No. 5:04-CV-00079-PSG-SS, 2005 WL 5519062, at *11 (C.D. Cal. August 16, 2005).  Chevron

25   contends that *City of Rialto* no longer is good law.

26       At a minimum, Rule 8(a)(2) requires "'a short and plain statement of the claim showing

27   that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . .

28   claim is and the grounds upon which it rests.'" *Twombly*, 550 U.S. at 555 (quoting *Conley v.*

20

1  *Gibson*, 355 U.S. 41, 47 (1957)).  Conceivably, the facts alleged in the SAC could provide the

2  "grounds" establishing a violation of state or federal law existing during or prior to 1977.  At

3  present, however, the allegations do not provide "fair notice" to Chevron of what law existing

4  during or prior to 1977 Chevron is alleged to have violated.

5          Chubb contends that the Court held previously that Chubb could survive a motion to

6  dismiss the statutory indemnity claim by alleging that Chubb meets the requirements set forth in

7  § 25356.1(a).  *Chubb Custom Ins. Co. v. Space Systems/Loral, Inc., et al.*, No. C 09-4485 JF

8  (PVT), 2010 WL 689940, at *9 (N.D. Cal. February 23, 2010).  However, the Court's comment

9  in its earlier order clearly was directed to Chubb's claim against Sun, which allegedly released

10 hazardous materials in 1989.  With respect to Chubb's claim against *Chevron*, the Court noted

11 that Chevron's argument with respect to retroactivity was "dispositive" unless Chubb either

12 could allege facts establishing Chevron's liability for acts or omissions occurring after January 1,

13 1982 or facts establishing that Chevron's pre-1982 actions were violations of state or federal

14 laws that existed at the time the actions occurred.  *Id.* at *8.

15         **4.      Negligence per se and strict liability**

16         Ford Motor argues that Chubb's claims for negligence per se and strict liability should be

17 dismissed because "Chubb has failed to plead facts establishing a right of subrogation based on

18 any right, claim or cause of action that Taube-Koret could assert against Ford Motor."  (Ford

19 Motor's MTD at 18:17-19.)  As discussed above, the operative pleading does allege facts that

20 support a reasonable inference that Ford Motor is liable to Taube-Koret for a CERCLA violation

21 and that Chubb has contractually subrogated that claim.  Again, however, this is not the case with

22 respect to Chubb's allegations as Chevron and Stevenson.

23         **5.      Whether each of the state-law claims is time-barred**

24         Moving Defendants contend that each of the state law claims is time-barred.  Irrespective

25 of whether a claim is brought under principles of tort or contract law, where an action is to

26 recover for injury to real property, the applicable statute of limitations is Cal. Code. Civ. Proc.

27 338(b), "which provides that the statutory period for commencing an action for injuring real

28 property . . . is three years, . . . regardless of the theory upon which relief is sought . . . ."

21

1  *Automobile Ins. Co. v. Union Oil Co.*, 85 Cal. App. 2d 302, 307 (Cal. App. 1948).  Because

2  Chubb's state-law claims are predicated upon injury to real property, they are subject to Cal.

3  Code Civ. Proc. 338(b).

4        Additionally, Chubb has not suffered the injury to real property itself but instead alleges

5  to have subrogated the claims of Taube-Koret.  "'[Equity] will enforce subrogation only when the

6  action is brought within the time in which an action could have been brought to enforce the

7  original obligation to which the right of subrogation is sought.'"  *Iusi v. City Title Ins. Co.*, 213

8  Cal. App. 2d 582, 588 (Cal. App. 1st Dist. 1963) (quoting *Howell v. Dowling*, 52 Cal. App. 2d

9  487, 498 (Cal. App. 1942)) (alterations in the original).

10      "Manifestly, whatever period of limitation was applicable to the insured herein
    passed by subrogation to the insurance carriers, who by reason of such

11      subrogation are put in the place of the party to whose rights they are subrogated.
    Upon principles of reason as well as natural justice, it seems only fair, right, just

12      and equitable that one who is subrogated to the rights and remedies of another
    should be allowed the same time in which to enforce such rights that the law

13      would have allowed to the person to whose rights and remedies he succeeds."

14  *Automobile Ins. Co. v. Union Oil Co.*, 85 Cal. App. 2d 302, 305 (Cal. App. 1948) (citations

15  omitted).

16        While Chubb points out that a CERCLA § 112(c)(2) subrogation claim may be brought

17  within three years of the date of payment of the claim that serves as the basis for subrogation, 42

18  U.S.C. § 9613(g)(4), the limitations period of 42 U.S.C. § 9613(g)(4) does not apply to Chubb's

19  state-law claims.  "[T]he statute of limitations established under State law shall apply in all

20  actions brought under State law for personal injury, or property damages, which are caused or

21  contributed to by exposure to any hazardous substance, or pollutant or contaminant, released into

22  the environment from a facility."  42 U.S.C. § 9658(a)(2).  Thus, while 42 U.S.C. § 9613(g)(4)

23  may apply to Chubb's § 112(c)(2) claim, Cal. Code Civ. Proc. 338 applies to Chubb's state-law

24  claims for contractual subrogation, equitable subrogation, statutory indemnity, negligence per se,

25  and strict liability.

26        Although CERCLA § 158(a)(1) establishes a narrow exception to CERCLA § 158(a)(2),

27  that exception provides no relief to Chubb.  CERCLA § 158(a)(1) provides that if the

28  commencement date under the state statute of limitations is earlier than the federally required

1   commencement date, then the limitations period "shall commence at the federally required

2   commencement date in lieu of the date specified in such State statute." 42 U.S.C. § 9658(a)(1).

3   The "federally required commencement date" is defined as "the date the plaintiff knew (or

4   reasonably should have known) that the personal injury or property damages . . . were caused or

5   contributed to by the hazardous substance or pollutant or contaminant concerned." 42 U.S.C. §

6   9658(b)(4)(A). Under California law, the commencement date is determined in a similar

7   manner: the limitations period of § 338 "commences to run when the plaintiff knows, or should

8   have known, of the wrongful conduct at issue." *Angeles Chem. Co. v. Spencer & Jones*, 44 Cal.

9   App. 4th 112, 119 (Cal. App. 2d Dist. 1996) (citing *CAMSI IV v. Hunter Technology Corp.*, 230

10  Cal. App. 3d 1525, 1533, 1536-38 (Cal. App. 6th Dist. 1991)).

11      **1.      Commencement of the limitations period for injury to 851 San Antonio Road**

12          Chevron and Stevenson contend that Taube-Koret and Chubb must have known of the

13  contamination at 851 San Antonio Road at least as of December 28, 2004, when Chubb issued an

14  endorsement to the insurance policy that excluded from coverage the "[p]ollution incident

15  associated with former UST(s) [underground storage container(s)] and product lines at the 851

16  San Antonio Road property . . . ." (SAC, Ex. A at 46.) Chubb alleges that the continuing ill-

17  effects of the leaking underground waste oil storage containers during the limitations period

18  should toll the statute of limitations, but it provides no authority for that proposition. Taube-

19  Koret's discovery of the containers started the running of the limitations period. While Taube-

20  Koret may not have known of the extent of the contamination or the full number of storage

21  containers, the limitations period pursuant to § 338 "commences to run when the plaintiff knows,

22  or *should have known*, of the wrongful conduct at issue " *Angeles Chem.*, 44 Cal App 4th at 120;

23  *see also* 42 U.S.C. § 9658(b)(4)(A).   In *CAMSI IV*, a property owner argued that while it had

24  discovered contamination on the property more than three years before filing the action, Cal.

25  Code Civ. Pro. 338 does not time-bar the action because it discovered additional contamination

26  within the three years preceding the filing. 230 Cal. App. 3d at 1537. The California Court of

27  Appeal rejected the argument, noting that "[g]iven notice of the presence of [hazardous

28  substances] anywhere on the property, the owner could properly be expected, in the exercise of

23

1    reasonable diligence, to conduct an adequate investigation of all parts of its property." *Id.*  Here,

2    Taube-Koret's knowledge of at least some of the underground storage containers in 2004 was

3    sufficient to start the running of the limitations period.  The instant action was not filed until

4    2009, and because Taube-Koret's claims were apparently time-barred, Chubb may not overcome

5    the bar through subrogation.  *Automobile Ins.*, 85 Cal. App. 2d at 305.

6           **2.     Commencement of the limitations period for injury to 901 San Antonio Road**

7           Based upon Chubb's allegations, Taube-Koret became aware of the contamination at 901

8    San Antonio Road by August 12, 2003, when the Water Board amended Order No. 99-043 to

9    include Taube-Koret as a named discharger responsible for cleanup of the site.  (SAC ¶ 20.)

10   Chubb contends that Ford Motor's "contamination was continuing in nature until [Taube-Koret]

11   could remediate."  (Chubb's Opp'n to Ford Motor's MTD at 20:2-3.)  As alleged by Chubb, Ford

12   Motor continued to operate the dewatering system, (SAC ¶ 55), and the operation of the

13   dewatering system causes continuous contamination, (SAC ¶ 55(d)).  Under California law, at

14   least with respect to a claim for nuisance, "'[e]very repetition of a continuing nuisance is a

15   separate wrong for which the person injured may bring successive actions for damages until the

16   nuisance is abated, even though an action based on the original wrong may be barred.'"  *Polin v.*

17   *Chung Cho*, 8 Cal. App. 3d 673, 678 (Cal. App. 2d Dist. 1970) (quoting *Phillips v. Pasadena*, 27

18   Cal. 2d 104, 107 (Cal. 1945)).  This is true even "if the nuisance may be discontinued at any

19   time." *Id.* (quoting *Pasadena*, 27 Cal. 2d at 107).  By analogy, each repetition of injury alleged

20   to have been caused by the dewatering system also is a separate wrong for purposes of Chubb's

21   claims for  negligence per se and strict liability.

22          Ford Motor contends that Chubb's allegation of a "continuing violation" operates to

23   defeat Chubb's subrogation claim on the merits, because it demonstrates that Taube-Koret has

24   not been made whole while up-gradient VOCs continue to migrate onto 901 San Antonio Road.

25   However, Chubb does not assert that the violation currently is continuing but rather that the

26   violation *was* "continuing in nature until [Taube-Koret] could remediate."  (Chubb's Opp'n to

27   Ford Motor's MTD at 20:2-3.)  As discussed above, the vapor barrier appears to have ended

28   Taube-Koret's future liability with respect to the contaminated groundwater.  At least as to this

                                                      24

1  aspect of Chubb's claims, Taube-Koret has been made whole as a result of Chubb's

2  reimbursement to Taube-Koret of the cost of the vapor barrier and other removal and remediation

3  costs.

4       Nonetheless, the state-law claims are time-barred based on the facts alleged in Chubb's

5  current pleading.  Chubb asserts that the soil at 901 San Antonio Road was remediated by July

6  2006, (SAC ¶ 23(a)), and that Taube-Koret submitted a claim to Chubb on July 20, 2006 for

7  "reimbursement of the Response Costs described in paragraphs 21 to 28 [of the SAC]," (SAC ¶

8  30).  The vapor barrier, while described at paragraph 24(d) of the SAC, must have been

9  completed as of July 20, 2006 in order for Taube-Koret to have sought reimbursement of the

10 costs associated with it.  Because Taube-Koret did not suffer injury from the dewatering system

11 after the vapor barrier was completed and because the vapor barrier was completed more than

12 three years before this action was filed, Chubb's state law claims with respect to 901 San

13 Antonio Road are time-barred by Cal. Code Civ. Proc. 338(b).

14              **IV.  MOTION FOR A MORE DEFINITE STATEMENT**

15      Chevron and Stevenson move in the alternative for a more definite statement, contending

16 that Chubb's allegations are "so vague or ambiguous that [they] cannot reasonably prepare a

17 response." Fed. R. Civ. P. 12(e).  Although the motions largely are moot in light of the foregoing

18 discussion, brief comment on the issues raised by the motions may benefit all of the parties by

19 assisting Chubb in amending its pleadings.

20       Chevron and Stevenson take issue with the manner in which the SAC uses the terms

21 "Site,""Response Costs," "Response Activities," and "Site Cleanup Requirements."  The SAC

22 defines "Response Activities" as activities performed in connection with "TKCJL's Property."

23 (SAC ¶ 21.)  The SAC defines "TKCJL's Property" as comprised of 851 and 901 San Antonio

24 Road, (SAC ¶ 17).  However, as discussed above, the SAC defines "[t]he Site" as "compris[ing]

25 approximately 47 acres and includ[ing] the properties located at 3825, 3963 and 3977 Fabian

26 Way and 901 San Antonio Road, Palo Alto, Santa Clara County, California (the 'Site')."  (SAC ¶

27 14).  Chubb also alleges that "a portion of the Site" is "referred to as '851 San Antonio Road,'"

28 (SAC ¶ 17), and that SS/L occupies all of the buildings on "the Site" except for a building at 901

25

1  San Antonio Road.  (SAC ¶ 47.)  However, Chubb also claims that Taube-Koret has constructed

2  some type of building on 851 San Antonio Road and that SS/L does not occupy any building

3  located at that address.  These allegations are confusing and should be clarified.

4        With respect to "Response Costs," the SAC defines the term as the costs incurred by

5  Taube-Koret "in complying with the Site Cleanup Orders . . . ."  (SAC ¶ 27.)  As discussed

6  earlier, Chubb does not allege that the Water Board has issued any orders with respect to 851 San

7  Antonio Road.  Moreover, the only claim for the reimbursement of "Response Costs" that Taube-

8  Koret is alleged to have submitted to Chubb is dated July 20, 2006, before Taube-Koret is

9  alleged to have incurred any remediation costs concerning 851 San Antonio Road.  (*See*

10  SAC ¶ 24(b).)  Although costs associated with the remediation of 851 San Antonio Road thus do

11  not meet Chubb's own definition of "Response Costs," Chubb seeks to recover $2,400,000 in

12  "Response Costs" from Chevron and Stevenson, whose only connection with this action is their

13  previous ownership of 851 San Antonio Road.  This apparent contradiction also should be

14  addressed in any amended pleading.

15  **V.  MOTIONS TO STRIKE**

16        Ford Motor moves to strike Chubb's references to private indemnity agreements between

17  Ford Motor, Ford Aerospace, and SS/L.  Chubb alleges that the indemnity agreements are

18  evidence that Ford Motor was involved actively in the operation of Ford Aerospace, but as

19  discussed above, an agreement to retain the liabilities of Ford Aerospace – standing alone – is

20  insufficient to support an inference that Ford Motor actually was involved in creating those

21  liabilities in the first instance.  Chubb also alleges that the indemnity agreements render Ford

22  Motor liable for any CERCLA violations committed by Ford Aerospace, but Chubb has not

23  alleged adequately its ability to assert rights under the indemnity agreements.  Nonetheless,

24  viewed in the light most favorable to Chubb, the allegations with respect to the private indemnity

25  agreement do not appear to be wholly immaterial or impertinent.

26        Ford Motor also moves to strike Chubb's prayer "[f]or a judgment that Defendants are

27  jointly and severally liable to Chubb . . . for response costs paid by Chubb as a result of

28  Defendants' releases of hazardous substances on and around [Taube-Koret]'s Property in an

1    amount *in excess* of $2,400,000." (SAC at 41.) Ford Motor seeks to strike this prayer because

2    Chubb alleges that its $2,400,000 payment to Taube-Koret has made Taube-Koret whole for the

3    contamination, in which case Chubb cannot seek to recover more than $2,400,000 for the alleged

4    release of the hazardous substances.  This argument is well taken.

5            Finally, Ford motor also seeks to strike Chubb's demand for a jury trial.  Another district

6    court has concluded that "[s]ubstantial case law supports the conclusion that CERCLA cost

7    recovery actions are equitable in nature and thus that no jury trial is available," and noted that the

8    one reported case in which a court declined to strike a demand for a jury trial with respect to a

9    CERCLA claim had been described as a "glaring exception."  *Cal. Dep't of Toxic Substances*

10   *Control v. Alco Pac., Inc.*, 217 F. Supp. 2d 1028, 1046, 1047 n.43 (C.D. Cal. 2002).  Chubb

11   claims that it still has a right to a jury trial with respect to its claims under California law, but as

12   discussed above, those claims are time-barred based on the allegations of the operative pleading.

13           Chevron and Stevenson move to strike Chubb's prayer "[f]or reasonable attorneys['] and

14   expert witness fees incurred by Chubb in bringing and prosecuting this action" and "[f]or costs of

15   this lawsuit" as "provided under California Health and Safety Code § 25363(e) . . . ."  (SAC at

16   42.)  Chevron contends correctly that neither CERCLA nor § 25363(e) permit such recoveries.

17   *See BNSF Ry. Co. v. California*, Nos. 2:08-CV-02225-JAM-JFM, 2:05-CV-02087-JAM-JFM,

18   2009 WL 55911, at *2 (E.D. Cal. Jan. 7, 2009) (holding that attorneys' fees are not recoverable

19   under either § 25363(e) or CERCLA because fees "incurred as 'litigation expenses' or 'in

20   pursuing litigation'" are not necessary costs because they "[do] not advance[] the cleanup of the .

21   . . site.");  *SPPI-Somersville, Inc. v. TRC Co.*, Nos. C 04-2648 SI, 07-5824 SI, 2009 WL

22   2612227, at *18 (N.D. Cal. Aug. 21, 2009) (quoting *Fireman's Fund Ins. Co. v. City of Lodi*, 302

23   F.3d 928, 953 (9th Cir. 2002)) ("Where a private litigant's attorneys fees 'have not advanced the

24   cleanup' of the contamination, those costs are not recoverable [under CERCLA].");  *Id.* (citing

25   *Louisiana-Pacific Corp. v. ASARCO Inc.*, 24 F.3d 1565, 1577 (9th Cir. 1994); *Gussack Realty*

26   *Co. v. Xerox Corp.*, 224 F.3d 85, 92 (2d Cir. 2000)) ("Similarly, expert costs incurred primarily

27   for litigation are not recoverable.").

28           Chubb contends that the motion to strike the prayer for attorneys' fees nonetheless is

27

1   premature because "some lawyers' work that is closely tied to the actual cleanup may constitute a

2   necessary cost of response in and of itself," and therefore may be a recoverable expense under

3   CERCLA and § 25363(e) "'because they are not incurred in pursuing litigation.'"  *Key Tronic*

4   *Corp. v. United States*, 511 U.S. 809, 820 (1994) (quoting *FMC Corp. v. Aero Industries, Inc.*,

5   998 F.2d 842, 847 (1993)).  Chubb asserts that the Court cannot determine which of Chubb's

6   attorneys' fees, expert witness fees, and costs are closely tied to the actual cleanup until Chubb

7   brings a motion for fees and costs.  However, Chevron points out that while aspects of Taube-

8   Koret's costs may have been "closely tied to the actual cleanup," costs incurred by *Chubb* solely

9   are for the purpose of pursuing litigation.

10      Chubb also argues that at least some of its costs are recoverable because "[Taube-Koret]

11   and/or Chubb" incurred costs in identifying other potentially responsible parties, costs that

12   expressly are recoverable under *Key Tronic*.  511 U.S. at 820.  However, the facts alleged in the

13   SAC do not support Chubb's contention that it incurred attorneys' fees or costs in connection

14   with identifying other potentially responsible parties.  Instead, Chubb alleges that Taube-Koret

15   submitted a claim for reimbursement of its response costs, (SAC ¶ 30), that Chubb reviewed that

16   claim, (SAC ¶ 33), and that Chubb paid $2,400,000.00 to resolve that claim, (SAC ¶ 34).

17   Moreover, Chevron seeks to strike Chubb's prayer "[f]or reasonable attorneys['] and expert

18   witness fees incurred by Chubb *in bringing and prosecuting this action*" and "[f]or costs of *this*

19   *lawsuit*," (SAC at 42), fees and costs incurred in pursuit of this litigation and not in connection

20   with the cleanup efforts.  Chevron's point is well taken.

21                                      **VI. CONCLUSION**

22      For the foregoing reasons, the motions to dismiss will be granted as set forth herein.

23   Because there is a reasonable possibility that at least some of the defects could be cured by

24   amendment, leave to amend will be granted.  Any amended complaint shall be filed within thirty

25   (30) days of the date of this order.  Chubb is urged to address carefully the defects noted

26   throughout this order and, among other things, to distinguish clearly its allegations with respect

27   to 851 San Antonio Road, on the one hand, and 901 San Antonio Road, on the other.  Because

28   the Court has granted Defendants' motions to dismiss on two previous occasions, Chubb is

1    cautioned that unless these issues are addressed, further amendment may not be permitted.

2

3    **IT IS SO ORDERED.**

4

5    DATED: 12/6/10

6                                                    _____
                                                     JEREMY FOGEL
                                                     United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 5:09-cv-04485 JF/PVT
ORDER GRANTING MOTIONS TO DISMISS WITH LEAVE TO AMEND
(JFEX1)